Sundar V. NILAVAR, M.D., Plaintiff,

v.

MERCY HEALTH SYSTEM–
WESTERN OHIO, et al.,
Defendants.

No. C–3–99–612.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 19, 2000.

---

178. Newell dep. at 45.

179. Brown testimony, Tr. at 169.

180. Brown testimony, Tr. at 170.

Lee C. Falke, Dayton, OH, Kenneth A. Lazarus, Washington, DC, for plaintiff.

Scott D. Phillips, Cincinnati, OH, John K. Cogan, Thomas Demitrack, Cleveland, OH, for defendants.

EXPANDED OPINION TO THIS COURT'S ENTRY OF SEPTEMBER 22, 2000 (DOC. # 41), SUSTAINING IN PART AND OVERRULING IN PART THE MOTION OF DEFENDANTS DIAGNOSTIC IMAGING ASSOCIATES OF OHIO, INC., AND ROBIN E. OSBORN, D.O., TO DISMISS, PURSUANT TO FED. R. CIV. P. 12(B)(6) (DOC. # 13) AND SUSTAINING IN PART AND OVERRULING IN PART THE MOTION OF DEFENDANTS MERCY HEALTH SYSTEM–WESTERN OHIO, CATHOLIC HEALTHCARE PARTNERS, MICHAEL PETERSON, AND JERROLD MAKI TO DISMISS, PURSUANT TO FED. R. CIV. P. 12(B)(6) (DOC. # 17); DEFENDANTS' MOTIONS FOR ORAL ARGUMENT (DOC. # 13, DOC. # 17) OVERRULED; HOSPITAL DEFENDANTS' MOTION TO STAY DISCOVERY (DOC. # 32–1) OVERRULED AS MOOT; HOSPITAL DEFENDANTS' MOTION FOR EXPEDITED HEARING ON THE MOTION TO STAY (DOC. # 32–2) OVERRULED AS MOOT; JOINT MOTION FOR STATUS CONFERENCE SUSTAINED (DOC. # 40); CONFERENCE CALL SET

RICE, Chief Judge.

For more than twenty years, Plaintiff Sundar V. Nilavar ("Nilavar") was a radiologist in the Springfield and Urbana, Ohio areas.[1] In 1976, Nilavar was hired by Springfield Radiology, Inc. ("SRI").[2] Between 1970 and 1995, SRI physicians provided physician diagnostic radiology

---

1. Since this case is before the Court on Motions to Dismiss, the factual background is taken from the allegations contained in Plaintiff's Verified Complaint (Doc. # 1). For purposes of these Motions, the Court has taken Plaintiff's factual allegations as true and has construed them in the light most favorable to him.

2. Dr. Nilavar became a shareholder of SRI in 1979.

services at the three hospitals and related facilities in the area centered around Springfield and Urbana, Ohio: Mercy Medical Center of Springfield, Ohio, and Mercy Memorial Hospital of Urbana, Ohio (collectively, the "Mercy Hospitals"); and Springfield Community Hospital. Mercy Health Systems–Western Ohio ("MHS–WO") owns and operates the Mercy Hospitals, in addition to several long-term and urgent care facilities in the Springfield–Urbana area. Dr. Nilavar maintained full clinical privileges at the Mercy Hospitals from 1976, until they were terminated on December 20, 1995, effective January 1, 1996.

In 1991, SRI was comprised of eleven principals. Five SRI radiologists practiced almost exclusively at Springfield Community Hospital ("Springfield group"), while the other six radiologists practiced almost exclusively at the Mercy hospitals ("Mercy group"). In 1993, SRI engaged in extensive negotiations with MHS–WO toward an exclusive contract for the provision of radiological services at the Mercy Hospitals and several other MHS–WO long-term care facilities. After several years of negotiations, no agreement had been reached.

On March 22, 1995, MHS–WO decided to conclude its negotiations with SRI, and to prepare a Request for Proposal ("RFP") for a contract of exclusive radiology services to interested radiologists and radiology groups. The physician-shareholders of SRI decided that the Mercy group would present a proposal to MHS–WO in response to the RFP. Without informing Plaintiff, Dr. Robin E. Osborn ("Osborn"), a physician-shareholder of SRI, formed his own radiology group, Diagnostic Imaging Associates of Ohio, Inc. ("DIA"), and sub-

mitted a proposal to MHS–WO on its behalf. DIA included only three physicians from SRI's Mercy group; Dr. Nilavar was not included in the new entity. In August of 1995, MHS–WO accepted DIA's proposal. An exclusive Radiology Services Agreement was signed on December 4, 1995, effective January 1, 1996. On December 20, 1995, MHS–WO notified Plaintiff that his clinical privileges would be terminated, effective January 1, 1996.[3] Dr. Nilavar requested that the Mercy Hospitals grant him a hearing, in accordance with the procedures set forth in the Credentials Policy Manual. His request was refused.

In 1996, Plaintiff filed suit in the Clark County Court of Common Pleas against Dr. Osborn and DIA, alleging breach of contract, estoppel, breach of fiduciary duty, and fraud arising out of Dr. Osborn's failure to negotiate the exclusive contract on his behalf. Plaintiff states that the case was tried to a jury in June of 1999, and that he received a judgment in the amount of $100,000. On April 7, 2000, the Second District Court of Appeals issued its ruling on the cross-appeals. That court upheld the jury's verdict in favor of Nilavar on the breach of contract claim and, due to the trial court's error in overruling Nilavar's motion to compel production of financial records from Osborn and DIA, it ordered a new trial on the issue of damages. *Nilavar v. Osborn*, 137 Ohio App.3d 469, 738 N.E.2d 1271 (2000).

On November 19, 1999, Plaintiff initiated the present litigation against MHS–WO; Catholic Healthcare Partners ("CHP"), MHS–WO's parent company; Michael J. Peterson ("Peterson"), the former Regional President and Chief Executive Officer of

---

**3.** In addition, Plaintiff has not had privileges at Springfield Community Hospital since that date.

MHS–WO; Jerrold A. Maki ("Maki"), Mr. Peterson's successor as Regional President and CEO of MHS–WO; Dr. Robin Osborn; and DIA. Plaintiff asserts eight causes of action, to wit: (1) contract in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) tying arrangement in restraint of trade, in violation of § 1 of the Sherman Act; (3) contract and tying arrangement in restraint of trade, in violation of Ohio's Valentine Act, Chapter 1331 of the Ohio Revised Code; (4) a state law claim of tortious interference with a business relationship; (5) a state law claim of breach of implied covenant of good faith and fair dealing; (6) a state law claim of civil conspiracy; (7) a state law claim of denial of right to due process; and (8) a state law claim of breach of contract.

Two motions to dismiss are presently pending before the Court: the Motion of Defendants DIA and Osborn to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. # 13); and the Motion of Defendants MHS–WO, CHP, Peterson, and Maki ("the Hospital Defendants") to Dismiss, pursuant to the same provision of the Civil Rules (Doc. # 17).[4] The two motions raise a number of identical arguments, although the Hospital Defendants' Motion is more detailed. As a means of analysis, the Court will address the two motions together, addressing the Hospital Defendants' arguments first. If necessary, the Court will turn to the additional arguments presented by DIA and Dr. Osborn. For the reasons assigned, Defendants' Motions are SUSTAINED in PART and OVERRULED in PART.

Defendants have requested oral argument on the issues raised in their Motions to Dismiss (Doc. # 13, # 17). The Court has concluded that oral argument is not necessary. The parties have thoroughly and competently briefed the issues. Based on the extensive memoranda submitted by counsel, the Court has been thoroughly apprized of the legal issues before it and the relevant case law. In addition, under Rule 12(b)(6), the Motions must be decided by reference to the Complaint only, including to the exhibits attached thereto. Fed. R.Civ.P. 10(c). Thus, the Court would not be permitted to consider any additional evidence or new factual assertions beyond the Complaint presented during oral argument. Furthermore, following the standard for Rule 12(b)(6) motions, the Court must construe Plaintiff's Complaint in the light most favorable to him and accept his factual allegations as true. Thus, the Court concludes that its review of the Complaint, construed in that manner, is sufficient to resolve the Defendants' Motions. Accordingly, the Court concludes that oral argument would not aide it in resolving the Motions. Defendants' Motions for oral argument are OVERRULED.

I. *Standard for Motions to Dismiss, Pursuant to Rule 12(b)(6)*

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir.)(citing *In re DeLo-*

---

**4.** Also pending before the Court are Dr. Nilavar's Motion to Disqualify Frost & Jacobs as counsel (Doc. # 25), the Hospital Defendants' Motion to Stay Discovery, pending a ruling on their Motion to Dismiss (Doc. # 32–1), the Hospital Defendants' Motion for an Expedited Hearing (Doc. # 32–2), and a Joint Motion for a Status Conference (Doc. # 40). The Motion to Disqualify will be addressed in a separate ruling. The other motions will be addressed *infra*.

*rean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993)), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997), *cert. denied,* 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998)("In considering a motion to dismiss for failure to state a claim, the Court is required to take as true all factual allegations in the complaint."); *Lamb v. Phillip Morris, Inc.,* 915 F.2d 1024, 1025 (6th Cir.1990), *cert. denied,* 498 U.S. 1086, 111 S.Ct. 961, 112 L.Ed.2d 1048 (1991). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. The Court is to dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## II. *Antitrust Claims (Counts One, Two, and Three)*

All of the Defendants seek dismissal of Plaintiff's antitrust claims. *First,* they argue that the first, second, and third causes of action are barred by the statute of limitations. *Second,* they argue that Plaintiff's first and third causes of action must be dismissed, because he has not suffered an antitrust injury. *Third,* the Hospital Defendants assert that Counts One, Two and Three must be dismissed, because Plaintiff is not an efficient enforcer of the antitrust laws. *Fourth,* all contend that Plaintiff's tying claims must be dismissed, because he has failed to allege that MHS–WO receives a "direct economic benefit" from the arrangement. *Finally,* Osborn and DIA assert that Plaintiff's third cause

of action is barred by the doctrine of *res judicata.* As a means of analysis, the Court will first address whether Plaintiff's action is timely, and then turn to the arguments dealing with antitrust standing. If necessary, the Court will next address Defendants' additional arguments.

### A. *Statute of Limitations*

■ The statute of limitations for federal antitrust actions is four years from the date of accrual of the action. 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. *Id.; see Grand Rapids Plastics, Inc., v. Lakian,* 188 F.3d 401, 405 (6th Cir.1999). "For statute of limitations purposes, . . . the focus is on the timing of the causes of injury, *i.e.,* the defendant's overt acts, as opposed to the effects of the overt acts." *Peck v. General Motors Corp.,* 894 F.2d 844, 849 (6th Cir.1990) (per curiam).

■ A continuing violation is one in which the plaintiff's interests are repeatedly invaded. *Id.* "When a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants." *DXS, Inc., v. Siemens Medical Sys., Inc.,* 100 F.3d 462, 467 (6th Cir.1996); *Barnosky Oils, Inc. v. Union Oil Co. of Cal.,* 665 F.2d 74, 81 (6th Cir.1981). "[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Peck,* 894 F.2d at 849 (quoting *Pace Indus., Inc., v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir.1987)). An overt act that restarts the statute of limitations is characterized by two elements: (1) it must "be a new and indepen-

dent act that is not merely a reaffirmation of a previous act," and (2) it must "inflict new and accumulating injury on the plaintiff." *Pace*, 813 F.2d at 238. "Acts that simply reflect or implement a prior refusal to deal, or acts that are merely 'unabated inertial consequences' (of a single act) do not restart the statute of limitations." *DXS, Inc.*, 100 F.3d at 467 (citations omitted).

■ Defendants argue that the relevant overt acts occurred in August of 1995 and on September 1, 1995. Specifically, they stated that by August of 1995, MHS–WO had accepted DIA's proposal for the exclusive providing of radiologic services (Compl.¶ 42). Dr. Nilavar became aware that MHS–WO had awarded DIA the contract on September 1, 1995 (*id.* ¶ 46). Defendants argue that MHS–WO's selection of DIA constituted an overt act, triggering the statute of limitations, and because Plaintiff did not file his antitrust action until November of 1999, his antitrust claims must be dismissed as untimely.

Plaintiff has responded that MHS–WO did not actually execute their exclusive Radiology Services Agreement until December 4, 1995. He further asserts that MHS–WO did not notify him of its intention to terminate his clinical privileges at the Mercy Hospitals until December 20, 1995, and the termination of his privileges did not become effective until January 1, 1996. Dr. Nilavar argues that Defendants' expression of their intent to enter into an exclusive agreement did not result in any damages. Rather, his damages and his ability to calculate those damages accrued, at the earliest, when the agreement was formalized on December 4, 1995. This Court agrees with Plaintiff.

Although MHS–WO selected DIA to be its exclusive provider of radiologic services in August of 1995, and Dr. Nilavar became aware of that fact on September 1st of that year, Defendants did not actually enter into an exclusive provider relationship, thereby committing an overt act, until December 4, 1995. In other words, Defendants allegedly agreed to commit acts, which Plaintiff alleges constitute antitrust violations, in August of 1995, when MHS–WO selected DIA. Dr. Nilavar became aware of their intention to commit those alleged antitrust violations on September 1, 1995. However, at the earliest, Defendants performed an overt act in furtherance of that agreement on December 4, 1995, when they formally entered into their exclusive relationship. Until that date, there had been no acts which would result in an antitrust injury to Plaintiff's business. Plaintiff received notification that MHS–WO would be terminating his clinical privileges at the Mercy hospitals on December 20, 1995, effective January 1, 1996. The Court agrees with Defendants that the notification merely constituted reaffirmation of MHS–WO's contract with DIA. However, Plaintiff filed this action in November, 1999, forty-seven months after DIA and MHS–WO had entered into their agreement on December 4, 1995. Plaintiff's action is, therefore, within the four-year statute of limitations for federal antitrust actions. Accordingly, Plaintiff's action is timely.[5]

### B. Antitrust Standing to Bring Claims for Contract in Restraint of Trade (Counts One and Three)

■ The Sixth Circuit has repeatedly emphasized the importance of antitrust standing. In *HyPoint Tech., Inc., v. Hew-*

---

**5.** Although Defendants do not address the statute of limitations for state law antitrust claims, the Valentine Act likewise has a four year statute of limitations. Ohio Rev.Code § 1331.12(B). Accordingly, Plaintiff's state law antitrust claim is also timely.

*lett Packard Co.,* it described antitrust standing as follows:

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

949 F.2d 874, 877 (6th Cir.1991). In determining whether Plaintiff has antitrust standing, the Court must consider whether he has suffered an antitrust injury and whether he is an efficient enforcer of the antitrust laws. *Associated General Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir.1994); *Leak v. Grant Med. Ctr.,* 893 F.Supp. 757, 762 (S.D.Ohio 1995); *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983); *Park Avenue Radiology Assocs. v. Methodist Health Sys., Inc.,* 1999 WL 1045098 (6th Cir. Nov. 10, 1999). The Court will address these two factors in turn.

### 1. *Antitrust Injury*

Defendants initially argue that the Court must dismiss Plaintiff's antitrust claims, because the Plaintiff has failed to allege that he has suffered an antitrust injury. In *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court first recognized the requirement that a private party bringing an action for treble damages for violations of federal antitrust laws must have suffered an antitrust injury. The *Brunswick* court reiterated that antitrust laws protect competition and not competitors and wrote that antitrust plaintiffs:

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489.[6] In *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), the Supreme Court explained that "injury, although casually related to an antitrust violation, nevertheless will not qualify as "antitrust injury," unless it is attributable to an anticompetitive aspect of the practice under scrutiny, since it is inimical to the [antitrust] laws to award damages for losses stemming from continued competition." *Id.* at 334, 110 S.Ct. 1884 (citations and internal quotation marks omitted).[7] In ad-

---

**6.** In *Brunswick,* the plaintiff had alleged that the defendant had violated § 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits anticompetitive mergers, by purchasing a bowling alley with which the plaintiff was in competition and which would have gone out of business if the defendant had not purchased it.

Since the defendant's transaction fostered rather than restrained competition, the Supreme Court concluded that the plaintiff had not, as a result, suffered an antitrust injury.

**7.** In *Atlantic Richfield,* the plaintiff, an independent retailer of gasoline, alleged that defendant, an integrated marketer of petroleum

dition, Ohio courts have held that a plaintiff must allege an antitrust injury in order to maintain an action under the Valentine Act, and have applied the jurisprudence developed by the Supreme Court in *Brunswick* and *Atlantic Richfield* to ascertain whether the plaintiff has suffered such an injury. *See Lee v. United Church Homes, Inc.,* 115 Ohio App.3d 705, 686 N.E.2d 288 (1996); *Schweizer v. Riverside Methodist Hospitals,* 108 Ohio App.3d 539, 671 N.E.2d 312 (1996).

In *Valley Products v. Landmark,* 128 F.3d 398, 403 (6th Cir.1997), the Sixth Circuit recently reviewed its jurisprudence relating to the antitrust injury doctrine:

> ... The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.

In *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), this court dealt with a situation where the plaintiff, a European manufacturer of armature winding machines, hoped to get into the business of manufacturing such machines in the United States. The plaintiff found itself foreclosed from entering the U.S. market after the defendant, an American subsidiary of a European competitor, obtained key patents from one American manufacturer and took over a second American manufacturer, a company holding a license to use the patents. Although the defendant's takeover of the latter company was assumed to violate § 1 of the Sherman Act and § 7 of the Clayton Act, our court did not view the antitrust violation as having inflicted the requisite antitrust injury. The harm of which the plaintiff complained, as the *Axis* panel saw it, was a direct result of the plaintiff's inability to obtain the patents, or a license to use the patents—and this harm did not "flow from" the element of the takeover that created the antitrust problem. *Id.* at 1112, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690.

The plaintiff in *Axis* never became a competitor in the American market, and the panel observed by way of dictum that perhaps a competitor could have stated a claim for damages. *Axis,* 870 F.2d at 1111–12. But the plaintiffs in *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), appear to have been in competition with two of the defendants in that case (Grand Ole Opry Tours and Opryland USA) for a short time prior to the advent of an allegedly illegal market-sharing agreement in the Nashville sightseeing tour and airport shuttle market. We nonetheless held in *Hodges* that the plaintiff shuttle operators could not claim antitrust injury when denied permission to drive their vans past the gates of the defendants' Opryland complex[:]

products, had violated § 1 of the Sherman Act, by engaging in a vertical conspiracy with its dealers to set maximum retail prices for gasoline at below-market levels. ("Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). Since the alleged conspiracy fostered competition by reducing the price of gasoline to consumers (the defendant was alleged to have conspired with its dealers to set a maximum price for gasoline, *i.e.,* a ceiling or price above which its dealers were not permitted to charge consumers, which had caused the plaintiff to reduce the price that it charged consumers, thus injuring the plaintiff by preventing it from charging higher prices), the Supreme Court concluded that the plaintiff had not suffered an antitrust injury.

"It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anti-competitive acts of Defendants, Plaintiff has not suffered an antitrust injury." *Id.* at 38 (quoting district court opinion).

In other words, as the *Hodges* panel put it, a violation of the antitrust laws was not a "necessary predicate" to the plaintiffs' loss of business:

> "Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 39.

*Id.* at 403–04. In *Valley Products,* the plaintiff was engaged in the business of manufacturing and selling guest amenities, such as soap, to hotels. The soap and other amenities were packaged in wrappers that bore the trademark of the hotel chain, of which the purchaser was a part. After the defendant, which owned the trademarks to a number of hotel chains, terminated the license under which the plaintiff had been permitted to use those trademarks on the products that it manufactured and sold, the plaintiff brought suit, alleging that the defendant had violat-

ed the Sherman Act. The Sixth Circuit affirmed the decision of the District Court to dismiss the plaintiff's claim under the Sherman Act, since the harm it had suffered flowed from the defendant's decision to terminate the license, rather than from any violation of the Sherman Act (illegal tying arrangement) and, therefore, the alleged antitrust violation was not a necessary predicate of the plaintiff's loss.

Defendants argue that this case is analogous to this Court's recent decision in *Baseball at Trotwood v. Dayton Professional Baseball Club, LLC,* 113 F.Supp.2d 1164 (1999) (Rice, J.). In that case, two groups competed to bring minor league baseball to Greater Dayton, Ohio, area.[8] The plaintiffs ("the Trotwood group") had obtained an oral agreement from the Cincinnati Reds' Managing Executive that if the Reds were to waive its territorial rights, it would be the exclusive group to locate in the Dayton area. In reliance upon that assurance, in March of 1997, the Trotwood group took steps to arrange for the construction of a stadium, and executed a contract to purchase the Michigan Battle Cats.

In March of 1997, a second group ("the Dayton group") began steps to bring a minor league team to Dayton. On May 30, 1997, the Reds issued a conditional territorial exclusivity waiver in favor of the Dayton group, despite its prior assurances to the Trotwood group. Thereafter, the Day-

---

8. A franchise could be located in the Dayton area by purchasing an existing franchise and moving it to the area. Anyone wishing to purchase a Midwest League franchise would initially be required to obtain approval from that League, by filing a Control Interest Transfer Application ("CIT"). If the Midwest League approved the CIT, the prospective purchaser would then have to obtain approval from the NAPBL and Major League Baseball ("MLB"). Having secured all three levels of approval to purchase the franchise, the pur-

chaser would then have to file an Application for Relocation ("AFR") with the Midwest League and, if the League gave its blessing, the approval process with the NAPBL and MLB would need to be repeated. In addition, since the Dayton area is within the protected territory of Defendant Cincinnati Reds ("Reds"), the purchaser who wished to transfer a franchise to that area would also be required to obtain a territorial waiver from that entity.

ton group contracted to purchase an existing team, and sought the necessary approvals from the Midwest League, NAPBL and Major League Baseball. The Dayton group received approval from the Midwest League and the NAPBL, but not from Major League Baseball. On September 26, 1997, the Reds terminated the conditional waiver of territorial exclusivity that it had granted to the Dayton group.

In November of 1997, the Reds again granted a waiver of its territorial exclusivity to the Trotwood group. That waiver would, in accordance with its terms, expire on January 26, 1998. While the waiver was in effect, a new group (the "Mandalay Defendants") began investigating the possibility of locating a minor league baseball team in Downtown Dayton. The Mandalay Defendants negotiated with a former member of the Dayton group about purchasing her interest in their team. On January 14, 1998, the Trotwood group filed its applications with the Midwest League and the NAPBL, seeking permission to purchase the Michigan Battle Cats and to move that franchise to the Dayton area. Both the Midwest League and the NAPBL refused even to review those applications, because the application filed by the Dayton group had not been withdrawn. As a result, the Trotwood group's period of exclusivity expired, before they were able to secure permission to purchase the Michigan Battle Cats and to move that franchise to the Dayton area. As a consequence, the Mandalay Defendants brought minor league baseball to the Dayton area.

The Trotwood group brought suit against (among others) the Dayton group, the Mandalay group, and the Reds, alleging, *inter alia*, that the Defendants conspired and acted in concert to restrain trade and to create a monopoly, in violation of §§ 1 and 2 of the Sherman Act (Count I). In addition, the plaintiffs alleged that those same Defendants violated the Valentine Act, Ohio's antitrust statutes, Chapter 1331 of the Ohio Revised Code (Count II). In addressing the Defendants' motion to dismiss, pursuant to Rule 12(b)(6), this Court concluded that the plaintiffs had not alleged that they had suffered an antitrust injury, because a reduction of competition, in the economic sense in the relevant market, would not flow from the decision to permit the Mandalay defendants rather than themselves to be the group permitted to purchase a minor league baseball franchise and to move it to this area. This Court further stated:

> Herein, the Plaintiffs' injury flows from the fact that only one group would be selected as the anointed monopolist in the minor league baseball market in the Dayton area, rather than from a decrease in competition among groups in that market. Moreover, since only one group would be selected to provide minor league baseball in this area, the Plaintiffs could have suffered the same injury had a group other than the Plaintiffs been selected, in the normal course of events, regardless of whether the Defendants had engaged in an alleged antitrust conspiracy. Accordingly, given that the Plaintiffs' injuries could have occurred absent conduct prohibited by antitrust laws, the alleged violations of those laws by the Defendants are not the necessary predicate of the injuries which the Plaintiffs claim to have suffered.

\* \* \* \* \* \*

[G]iven that the Plaintiffs have not alleged that the Defendants' actions limited the number of franchises that would be allowed to be located in the Dayton area, there is no allegation that the actions of the Defendants altered the market structure for minor league baseball

in the Dayton area, increased prices or reduced the quantity of minor league baseball supplied in that area. In short, there are no allegations that the Defendants' actions curtailed competition in the minor league baseball market in the Dayton area, only that those actions curtailed the Plaintiffs' ability to be the entity servicing that market. Only one minor league team would be located in the Dayton area, regardless of whether the Plaintiffs, the Mandalay Defendants or some other group were the successful competitor for the right to become the owner of that team. In other words, there was bound to be one winner and one loser of that competition, and one and only one monopolist would emerge to provide minor league baseball in this area. While there is an allegation, but no facts alleged to support the conclusion that the Defendants' alleged violations of the Sherman and Valentine Acts caused an injury to consumers by restricting competition, the Court concludes that the Plaintiffs have not sufficiently alleged that they have suffered an antitrust injury. Regardless of whether the actions of the Defendants may have affected competition in the market to acquire minor league baseball teams, generally, or the team that would be permitted to be located in the Dayton area, specifically, the Plaintiffs have not alleged that they have suffered an antitrust injury, in the absence of the contention that those actions have harmed consumers. In other words, although the actions of the Defendants may have harmed one of the groups competing to bring minor league baseball to this area and, further, while those actions may constitute business torts, those actions did not cause the Plaintiffs to suffer an antitrust injury, since they did not prevent the Plaintiffs from being one of two or more groups presenting minor league

baseball in this area. It was always understood that Dayton would be a one-team market. There is no allegation, in short, that the Defendants' actions curtailed competition in the minor league baseball market in this area, by hurting one group's ability to compete in a multi-team market.

(Doc. # 4 at 17–18, 20 –2)(footnotes omitted).

 Upon reviewing Plaintiff's Complaint, Dr. Nilavar has alleged that the harm he suffered was the result of an antitrust violation. The conduct of which Plaintiff complains, the execution of an exclusive agreement between a hospital and group of physicians, is not *per se* lawful. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 n. 51, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("Like any exclusive requirements contract, this contract could be unlawful if it foreclosed so much of the market from penetration by Roux's competitors as to unreasonably restrain competition in the affected market, the market for anesthesiological services."); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1488 (9th Cir.1991). The Supreme Court has recognized that exclusive contracts may violate federal antitrust laws when they unreasonably restrain trade, *Jefferson, supra; Smith v. Northern Mich. Hosp., Inc.*, 703 F.2d 942 (6th Cir.1983), and that the health care profession is not immune from scrutiny under federal antitrust laws. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 465–66, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (upholding FTC's ruling that dentists violated antitrust laws by agreeing to withhold x-rays from insurers); *Jefferson, supra; Leak*, 893 F.Supp. at 763 ("The Court does not find ... that the above authorities establish a *per se* rule that a health care professional could never have standing to assert

antitrust claims arising from the denial of hospital staff privileges.")

In his Complaint, Plaintiff has alleged the relevant markets and the injuries to competition in those markets. *Continental Orthopedic Appliances, Inc., v. Health Ins. Plan of Greater N.Y., Inc.,* 40 F.Supp.2d 109, 117 (E.D.N.Y.1999)("On a motion to dismiss, under the rule of reason, the plaintiff must 'identify the relevant product market and allege how the net effect of the alleged violation is to restrain trade in the relevant market.' ") (citations omitted). In particular, he alleges that the relevant geographic market is the Springfield–Urbana area, and that the relevant product markets are physician diagnostic radiology services and hospital services. He further alleges that MHS–WO is one of only two hospital organizations in the Springfield–Urbana area. Whether Plaintiff has alleged relevant markets for antitrust purposes is a question of fact for the jury. *Fishman v. Estate of Wirtz,* 807 F.2d 520, 531 (7th Cir.1986) (trier of fact determines relevant market); *Raiders I,* 726 F.2d at 1394 (jury need not accept either parties' definitions of the relevant market). For purposes of a motion to dismiss, the Court must accept the market designations alleged as true. *Murray v. National Football League,* 1996 WL 363911, *24 (E.D.Pa. June 28, 1996); *see In re Cardizem CD Antitrust Litigation,* 105 F.Supp.2d 618 (E.D.Mich.2000).

As to specific allegations of an antitrust injury, Plaintiff has alleged that he practiced radiology in the alleged relevant geographic market, and that he competed in the physician diagnostic radiology services market. He further alleges the following injuries as a result of Defendants' conduct: 1) that his and other physicians' ability to compete in the market for physician diagnostic radiologic services has been restrained or eliminated; 2) that purchasers of physician diagnostic radiologic services in the area centered around Springfield and Urbana have been deprived of free and open competition in the sale of such services; 3) that competition regarding the price and quality of physician diagnostic radiologic services in the relevant market have been suppressed; 4) that patient care in the relevant geographic market has been harmed by the lack of competition; 5) that quality assurance and pooling of knowledge have been drastically reduced; 6) that patients and referring physicians in the relevant geographic market have been deprived of the choice of physician diagnostic radiology service providers; 7) that a significant number of consumers of physician diagnostic radiology services are now forced to purchase such services from DIA when they would prefer other physicians; and 8) that patients and referring physicians have been deprived of information regarding the quality of physician diagnostic radiology services. In short, Dr. Nilavar alleges that, as a result of Defendants' conduct, his ability to compete has been restrained, resulting in higher prices, lower quality services, and less choice for consumers and their physicians. These allegations constitute the kind of injuries that the antitrust laws were enacted to prevent. *Compare Korshin v. Benedictine Hosp.,* 34 F.Supp.2d 133, 138 (N.D.N.Y. 1999) (dismissing, pursuant to Rule 12(b)(6), for lack of antitrust injury, when plaintiff failed to allege, *e.g.,* any change in the price of anesthesiology services, a decrease in quality or efficiency of care, or that the consumers of anesthesiology services, be they patients, referring physicians, or third-party payers, have less of a market choice, other than their inability to select plaintiff, as a result of defendants' actions).

Plaintiff's allegations survive the Sixth Circuit's necessary predicate test. *Valley*

*Products, supra.* Unlike *Valley Products,* in which the plaintiff's exclusion from the market flowed from the decision to terminate the license, rather from the alleged illegal tying arrangement, Plaintiff's exclusion from the Springfield–Urbana market allegedly stems from the exclusive contract. Although Defendants argue that Plaintiff's exclusion stems from his failure to apply for and to be awarded the exclusive contract and from his lack of association with DIA, the Complaint alleges, when construed in the light most favorable to Plaintiff, that his failure to apply and DIA's award of the exclusive contract stem from a conspiracy among Defendants. The Complaint further alleges that his injuries flowed directly from this conduct and the effect of the exclusive contract. In addition, as Plaintiff notes, he has requested, in his prayer for relief, that the exclusive contract be enjoined, not that it be awarded to him.[9]

Furthermore, unlike the plaintiffs in *Baseball at Trotwood,* Dr. Nilavar has alleged that a *reduction* in competition flows directly from the exclusive contract between DIA and MHS–WO. He alleges that, as a result of Defendants' activities, the number of providers of radiologic services was curtailed, and that he and other physicians, who are direct competitors of DIA, were excluded from the existing Springfield–Urbana market. Unlike the competitors for a Dayton minor league team, Dr. Nilavar and DIA did not compete to provide a new product (radiologic services) in the Springfield–Urbana area, under circumstances in which it was un-

derstood that only one provider would be selected. Nilavar and DIA did not compete to be a monopolist in a new market, nor did they compete to join the existing market of radiologic providers. Rather, Plaintiff alleges that prior to the exclusive contract, there were a number of providers of radiologic services and that, as a result of the contract between Defendants, the competition among radiologists to provide such services in that area was reduced. To be clear, Plaintiff has alleged that "but for" the exclusive contract, he would still be practicing in the Springfield–Urbana area. Thus, he has alleged that the contract, allegedly in violation of the antitrust laws, was a necessary predicate to his injury. *In re Cardizem CD Antitrust Litigation,* 105 F.Supp.2d 618 (2000)(using 12(b)(6) standard to determine whether antitrust injury has been alleged). Defendants' argument that this Court's decision in *Baseball at Trotwood* requires the conclusion that Plaintiff has failed to allege an antitrust injury is without merit.

Defendants have further argued that Plaintiff has failed to allege an antitrust injury, because MHS–WO merely substituted one exclusive provider of radiologic services (SRI) with another (DIA). They assert that there has been no alteration in the amount of competition in the market, and from the standpoint of consumers, the market remains unchanged. Decisions within the Sixth Circuit support Defendants' argument that a plaintiff cannot establish an antitrust injury if a hospital merely substitutes one exclusive provider with another. *E.g., Mid–Michigan Ra-*

---

9. Defendants suggest that Plaintiff would not have brought this action had Dr. Nilavar been a member of the group which was awarded the exclusive contract. Although this may, in fact, be the case, the Court must focus on the Complaint, accepting the factual allegations as true and construing them in the light most favorable to Plaintiff. With that standard in mind, Plaintiff has complained of the negative effect that the contract has on competition as a whole in the Springfield–Urbana area. The Court, therefore, cannot conclude that Plaintiff's discontent with the exclusive contract is solely based on the fact that it was awarded to DIA rather than to him.

*diology Assocs. v. Central Mich. Community Hosp.*, 1995 WL 239360 (E.D.Mich. Feb. 14, 1995), citing *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir.1994). However, Plaintiff has not alleged that SRI provided radiology services at the Mercy Hospitals, pursuant to an exclusive arrangement (either contractual or de facto) between those entities. In fact, there are no allegations that SRI was an exclusive provider of radiologic services at the hospitals. The sole allegations with regard to the relationship between SRI and MHS–WO state that, beginning in 1993, SRI and the MHS–WO began negotiations towards an exclusive contract for the provision of radiologic services at the Mercy Hospitals and several other MHS–WO long-term care facilities. These negotiations concluded, without successfully reaching an agreement, on March 22, 1995. These allegations do not support the inference that SRI had previously provided radiologic services to MHS–WO under an exclusive arrangement. Likewise, the allegations do not support an inference that the contract between the Mercy Hospitals and DIA constitutes merely a reshuffling of radiologic service providers. In summary, although undisputed evidence in support of Defendants' assertion that SRI operated under an exclusive arrangement at the Mercy Hospitals might justify a grant of summary judgment in favor of Defendants on this issue, the Complaint does not contain allegations of such an arrangement. Accordingly, the Court cannot dismiss Plaintiff's antitrust claims, pursuant to Rule 12(b)(6), on that basis.

■ Defendants also contend that Plaintiff has not suffered an antitrust injury, because the exclusive contract has a pro-competitive effect. Although the contract between DIA and MHS–WO may, in fact, have a pro-competitive effect on the market for radiologists and radiological services, the Court cannot make a conclu-

sion to that effect, as a matter of law. The extent of the pro-competitive and anti-competitive effects of a given contract requires a factual inquiry, considering the circumstances of the exclusive dealing arrangement and their effect on competition in the relevant market. Therefore, although a number of courts have concluded that exclusive contracts in the health care industry are beneficial and pro-competitive, the Court cannot reach such a conclusion without evidence of this contract's effect on the relevant market. *See Balaklaw,* 14 F.3d at 799, n. 13. The Court will not dismiss Plaintiff's antitrust claims, pursuant to Fed.R.Civ.P. 12(b)(6), on the ground that the contract is pro-competitive.

Defendants have asserted that Plaintiff's antitrust claims must be dismissed, because the award of the exclusive contract to DIA is the result of healthy competition between competing radiologists. Numerous courts have stated that where an exclusive contract for the provision of medical services has resulted from competition between providers for the contract, the contract is not a restriction on competition but, rather, is the result of competition. *E.g., Balaklaw,* 14 F.3d at 801–2 ("It is the nature of competition that at some point there are winners and losers, and the losers are excluded ... By closing its doors to Dr. Balaklaw in favor of one of his competitors, CMH did nothing to inflict an injury of the type the antitrust laws were intended to prevent."); *Dos Santos v. Columbus–Cuneo–Cabrini Medical Ctr.,* 1983 U.S. Dist. LEXIS 12377 (N.D.Ill. Oct. 25, 1983)("The exclusive anesthesiology contract between the Medical Center and Anesthesia Associates is the result of competition, not a restriction on competition. It is the result of a process of rivalry to be the hospital's supplier of anesthesia services over a period of time."); *see also Baseball at Trotwood, supra.*

In his Complaint, Dr. Nilavar alleges that after SRI failed to reach an agreement with MHS–WO, MHS–WO decided to prepare a Request for Proposal ("RFP") for a contract for the provision of exclusive radiology services to interested radiologists and radiology groups (Compl.¶ 37). The RFP was published on April 27, 1995. Plaintiff alleges that the Mercy group of SRI voted to submit a bid but, unbeknownst to SRI members, Dr. Osborn formed his own corporation, DIA, and submitted a proposal for the MHS–WO contract. There is no indication as to how many other entities, if any, bid on the radiology services contract. DIA was awarded the contract in August, 1995. Plaintiff has further alleged that MHS–WO and DIA have conspired to prevent him and other radiologists from providing radiology services to the Mercy hospitals and other MHS–WO facilities. Accepting these facts as true and construing them in the light most favorable to Plaintiff, Plaintiff's Complaint could reasonably be interpreted to allege that the RFP was a sham and Defendants conspired to award the contract to DIA. The Court will not dismiss Plaintiff's claim on this basis, on a Rule 12(b)(6) motion.

In addition, Defendants contend that the exclusive radiology services contract has no adverse effect on competition, because of its limited, one-year duration. Many courts have considered the duration of a contract to be one of many factors considered in determining whether a given exclusive contract is anti-competitive. See Hovenkamp, Antitrust Law ¶ 1802g (1998). "Others have noted that where exclusive distribution contracts were either of short duration or terminable on relatively short notice, any alternative manufacturer could come along and offer a distributor a better deal." *Id.* The *Balaklaw* court, for example, found that the plaintiff lacked antitrust standing, due to the short duration of the exclusive contract involved:

> Even at CMH, opportunities for competition remain, since the contract with Dr. King has a term of only three years and may be cancelled [sic] without cause upon six-months' notice. In *Konik v. Champlain Valley Physicians Hospital Medical Center,* 733 F.2d 1007, 1014–15 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), we rejected an antitrust challenge to an anesthesiology contract in part because the parties were free at the end of any six-month period to terminate the agreement. Here, as there, "the Hospital [is] free at the end of six months to enter into a new arrangement either with [the current group] or with any other anesthesiologist." *Id.* at 1015. Such a situation may actually encourage, rather than discourage, competition, because the incumbent and other competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions. We thus see no "foreclosure of competition" in either of the two relevant markets, and consequently, we find no antitrust injury.

*Balaklaw,* 14 F.3d at 799. However, other terms of the exclusive contract, such as the presence of a significant penalty attached to terminating the agreement, may result in contracts of short duration or contracts terminable on relatively short notice having an anti-competitive effect. *Id.; U.S. Healthcare,* 986 F.2d at 596.

In the present case, Plaintiff has attached the exclusive contract between MHS–WO and DIA to his Complaint (Compl.Ex.3). According to that document, the exclusive contract between those parties has an initial term of two years, and the contract would automatically renew for successive one-year terms (*id.*

¶ 11). At the end of the first year, the contract is terminable by either party, without cause, with ninety-days notice (*id.* ¶ 12).[10] On their face, these terms do not appear to unreasonably restrain competition, because, as stated by the *Balaklaw* court, MHS–WO is free at the end of that period of time to enter into a new arrangement, either with DIA or with any other radiologist.

Accepting Plaintiff's allegations as true and construing them in the light most favorable to him, however, Plaintiff's Complaint could reasonably be interpreted to allege that the term of the exclusive contract does not render the contract reasonable, when considered in light of the extent that the relevant market is foreclosed. Dr. Nilavar has alleged that the he was unable to secure privileges at Springfield Community Hospital and that, as a result, he has been *entirely* foreclosed from the Springfield–Urbana physician diagnostic radiology services market due to the contract between DIA and MHS–WO (Compl.¶ 50). Accepting that statement as true, it is unlikely that Dr. Nilavar and other similarly-situated radiologists would remain in the Springfield–Urbana area for two years, pending the opportunity to seek a contract with MHS–WO, and, thus, to practice their profession. Likewise, it is similarly unlikely that Plaintiff and others similarly situated will remain in the area, hoping that either party to the agreement will decide to terminate same. With this scenario, the supposed opportunity to compete two years hence would be illusory. Accordingly, the Court will not conclude that Plaintiff has failed to state a claim upon which relief may be granted, even though he has alleged that the exclusive contract has an initial two year term and is terminable thereafter on short notice.

The duration of the exclusive contract is merely a factor which the Court will consider, when presented with relevant evidence, in determining whether the contract unreasonably restrains trade.

Accordingly, Plaintiff has adequately alleged that he has suffered an antitrust injury.

### 2. *Efficient Enforcer*

■ Defendants assert that Plaintiff lacks standing to bring his antitrust claims, because he is not an efficient enforcer of the antitrust laws. "[I]t is not enough ... that plaintiffs can show that defendants' conduct caused them injury. *Associated Gen. Contractors*, 459 U.S. at 535 n. 31, 103 S.Ct. 897. Plaintiffs also must show that their injuries were sufficiently direct and that they would be efficient enforcers of the antitrust laws. *See id.*" *Leak*, 893 F.Supp. at 762. A number of courts have held that physicians lack antitrust standing on the ground that they are not efficient enforcers of antitrust violations which arise out of exclusive contracts with physicians. As stated by the court in *Korshin v. Benedictine Hosp.*, 34 F.Supp.2d 133 (N.D.N.Y.1999):

Numerous courts have held that a physician is not the most appropriate person to enforce potential antitrust violations in circumstances similar to those presented here. Rather, patients, referring physicians, and third-party payers, and the government would be more "efficient enforcers" of the antitrust laws because they have stronger interests in ensuring that prices, services, quantity and quality remain at competitive levels.

*Id.* at 140. Other courts, however, have concluded otherwise. For example, the Third Circuit recently stated in *Angelico v.*

---

10. Other terms also allow for termination in case of default, bankruptcy or dissolution, or criminal activity by one of the parties. (Compl. Ex. 3 ¶ 12(b) and (c)).

*Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir.1999):

First, because no discovery was allowed on the issue, we must assume Angelico's allegation that the defendants acted in concert and with an anticompetitive motive, *i.e.*, conspired, is true. Following this assumption, Angelico's harm clearly resulted from the conspiracy that prevented him from competing in the market and thereby earning a living. At this stage, therefore, the causal connection/defendant intent element of the standing analysis is satisfied.

Turning to the second element, whether Angelico's alleged injury is of the type the antitrust laws were meant to redress, we conclude that the injury he suffered, when shut out of competition for anticompetitive reasons, is indeed among those the antitrust laws were designed to prevent. * * *

Angelico also satisfies the third, fourth and fifth elements of the *AGC* standing analysis. The injury to Angelico from the assumed conspiracy is clearly direct (and substantial). Angelico's injury is the direct result of the alleged conspiracy. In contrast, the harm to consumers is less direct because it will only arise from higher costs or poorer treatment that result from the removal of a strong competitor from the market. A consumer would be highly unlikely to sue for a loss of this type. Finally, there is no potential for duplicative recovery or complex apportionment of damages, because Angelico's injury has not been passed along to others.

*Angelico*, 184 F.3d at 274–75; *Allen v. The Washington Hosp.*, 34 F.Supp.2d 958, 962 (W.D.Pa.1999)("Here, the Defendants … would have this Court essentially adopt a per se rule denying standing to any physician who challenges alleged exclusionary practices. No court has adopted such a rule, and I decline the Defendants' invitation to do so."). In analyzing whether Plaintiff is an efficient enforcer, the Court must consider the four factors set forth in *Southaven*, to wit: (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (3) the potential for duplicative recovery or complex apportionment of damages; and (4) the existence of more direct victims of the alleged antitrust violation.

■ *First,* Plaintiff has alleged that the antitrust violation has caused him harm. Turning to the Complaint, Count One states that Defendants have conspired to exclude Plaintiff and other radiologists from supplying physician diagnostic radiology services at the Mercy hospitals and other facilities, and to eliminate competition between Plaintiff and other radiologists in the provision of such services in the Springfield–Urbana area. Plaintiff further alleges that he has been foreclosed from that market due to Defendants' conduct. Thus, Plaintiff has alleged that Defendants intended to eliminate competition in the physician diagnostic radiology services market, and their conduct has caused him (and other radiologists) injury. *Second,* that injury is direct, because Plaintiff has been foreclosed from the Springfield–Urbana market, as was the alleged intent of Defendants. *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1082 (9th Cir.2000)("To the extent that Appellees' practices drove certain health care providers out of business, it was the providers who suffered the injury."). Moreover, it is likely that Plaintiff could calculate his lost income due to his unlawful foreclosure from the physician diagnostic radiology services market in the Springfield and Urbana, Ohio, area. Thus, there is no indica-

tion that his damages would be speculative.

As for the third and fourth factors, it is apparent that there are other possible efficient enforcers of the alleged antitrust injuries. Plaintiff has asserted numerous injuries to patients (*e.g.*, higher prices, lower quality care, less choice of physicians) and to referring physicians (*e.g.*, less choice, less information about quality of care). In addition, if Defendants' conduct is anti-competitive, the government would also have an interested in halting the illegal activity. However, Plaintiff has also alleged that Defendants acted to eliminate him and other competitors from the market and that they have done so. Although Plaintiff is a rival of DIA, not a consumer of physician diagnostic radiology services, he has a strong interest in ensuring that his ability to compete is not unlawfully extinguished. In addition, although there are others who would be efficient enforcers of the antitrust laws in the circumstances presented herein, thus creating a risk of duplicative actions, it is unclear whether patients and third-party providers would pursue this litigation. Accordingly, the Court will not dismiss Plaintiff's antitrust claims (Counts One, Two, and Three) on the ground that he is not an efficient enforcer of the antitrust laws herein.

### C. *Tying Arrangment Claims (Count Two and a Portion of Count Three)*

 Defendants challenge Plaintiff's claim that the exclusive contract constitutes a tying arrangement on two grounds. *First,* they argue that they do not condition all Mercy Hospital patients' purchases of hospital services on their purchase of radiological services. *Second,* they assert that the claim must be dismissed, because the hospital does not receive a direct economic benefit.

A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citations omitted). To establish an illegal tying arrangement, Plaintiff must demonstrate (1) that the Hospitals' requirement that patients obtain necessary radiologic services from DIA combined the purchase of two distinguishable services in a single transaction, and (2) that patients are forced to purchase DIA's services as a result of the hospitals' market power. *Jefferson,* 466 U.S. at 24, 104 S.Ct. 1551. In addition, an illegal tying arrangement cannot exist unless the plaintiff can establish that the MHS–WO had a direct economic interest in the tied product. *Beard v. Parkview Hosp.,* 912 F.2d 138 (6th Cir.1990).

In his Complaint, Dr. Nilavar alleges that the tying product is hospital services, and the tied product is physician diagnostic radiology services. (Compl.¶¶ 72–73) He describes the alleged illegal arrangement as follows: patients and referring physicians agreed, as a condition of receiving hospital services, that they will purchase any needed physician diagnostic radiology services from DIA, when the patients or referring physicians would prefer to purchase radiologic services from someone else under different terms. In addition, Plaintiff has alleged that MHS–WO and/or CHP holds a dominant market position in the relevant geographic market (the Springfield–Urbana area),

and that the tying arrangement affects a substantial volume of commerce. *Id.*

*First,* Defendants argue that Plaintiff has not alleged a tying arrangement, because he has not alleged that Defendants condition all Mercy hospital patients' purchases of hospital services on their purchase of radiological services. Antitrust claims identical to those presented herein have been recognized in the Sixth Circuit. *See Beard v. Parkview Hosp.,* 912 F.2d 138, 140–41 (6th Cir.1990) ("[T]he alleged tying arrangement challenged in this case arises from the exclusive contract Parkview entered into with Bucholz for the provision of radiological services. Consequently, under the *Jefferson Parish* analysis, [which set forth the two prongs of an illegal tying claim,] we must decide whether Parkview's contract with Bucholz is illegal as forcing surgical patients at Parkview to obtain radiological services from Bucholz which they might wish to obtain from another provider or as unreasonably restraining competition among radiologists in the Parkview area."). Because the Sixth Circuit has recognized tying arrangement claims based on a contract which requires hospital patients to obtain services from a particular provider, the Court will not dismiss Plaintiff's tying claims on this ground.

*Second,* Defendants contend that Plaintiff's allegations are insufficient, because he has not alleged a direct economic benefit to Defendants MHS–WO and CHP as a result of the contract. The Sixth Circuit has held that defendants must receive a direct economic benefit, such as professional fees for the tied product, for a contract to constitute an illegal tying arrangement. *Beard,* 912 F.2d at 141. ("The district court's reliance on the "direct economic benefit" rule was well-grounded in antitrust law … An absence of direct economic benefit was taken as a determi-

native indicator that the provider of the tying product or service had no anti-competitive impact upon the market for the tied product or service."). In *Beard,* a radiologist alleged that a hospital had engaged in an illegal tying arrangement when it entered into an exclusive contract with another radiology service. The Sixth Circuit affirmed the district court's grant of summary judgment to the hospital on the tying claim, stating:

> In its decision granting Parkview's motion for summary judgment, the district court said:
>
>> In order for a tying arrangement to violate § 1 of the Sherman Act, the seller must exploit its market power over the tying product to force the buyer into purchasing a tied product that the buyer either did not want at all, or might have preferred to purchase from someone else. An implicit requirement to a finding that a tying arrangement violates § 1 is that the seller of the tying product must also profit from the sale of the tied product.
>
> The district court went on to say that, "[i]n all of the cases addressing this question which the Court is aware of, the courts require that the seller of the tying product must have benefited directly from the sale of the tied product." And, "[i]n this case, it is clear from the evidence before the Court that none of the monies paid to Bucholz, Inc. reached Parkview's hands. Therefore, the Court finds defendants' motions for summary judgment as to plaintiff's § 1 claim well taken."

*Id.* In *Scara v. Bradley Mem'l Hosp.,* 1993 WL 404150 (E.D.Tenn. Feb. 4, 1993), the district court likewise dismissed a physician's tying claim against a hospital, stating that the hospital did not share in the professional fees for the anesthesiological

services. It rejected the plaintiff's argument that the hospital had enhanced its revenues as a result of the exclusive contract for anesthesiological services, because surgical services, recovery rooms, and anesthesiology equipment and supplies were more fully utilized by consumers. The court reasoned that such indirect economic benefits do not rise to the level of economic benefits as required for an illegal tying arrangement. *Id.* at *5; *see also Leyba v. Renger*, 874 F.Supp. 1229, 1233 (D.N.M.1994)(the fact that exclusive contract between hospital and anesthesiologists may prevent hospital from losing patients was an indirect benefit, not a direct economic benefit as required for an illegal tying arrangement).

Herein, Dr. Nilavar alleges that, as a result of the "forced sale of Defendant DIA's physician diagnostic radiology services," MHS–WO and CHP have derived increased revenues and have benefitted financially. Specifically, he alleges that they have derived a direct economic benefit from: 1) contract terms which require DIA's participation in the Springfield Physician Hospital Organization; 2) contract terms which required DIA's participation in certain managed care contracts which provide for unitary fees;[11] 3) contract terms that require DIA to accept insurance or other third-party payment as payment in full for medical services provided to employees of MHS–WO, and denies DIA the opportunity to request additional payment from such employees; and 4) Plaintiff's exclusion from the practice of radiology at the Mercy hospitals in that such exclusion has "silenced" his criticism of MHS–WO regarding the management of radiology personnel and of quality issues related to patient care and procedures at the Mercy hospitals.[12] Accepting Plaintiff's allegations as true and construing them in the light most favorable to him, Plaintiff's first, third and fourth alleged benefits do not constitute direct economic benefits. MHS–WO and CHP's alleged increased revenues are not the result of receiving a share of the professional fees which DIA receives for providing radiologic services. Rather, they are akin to the indirect benefits noted by the *Scara* court.

■ With regard to the unitary fee billing, the parties dispute whether the contract results in MHS–WO and CHP receiving a direct economic benefit. Defendants argue that when they bill a unitary fee, the fee is split such that each party receives revenues in the same proportion as they receive when their services are billed separately. Plaintiff argues that the contractual provision does not provide that DIA and the MHS–WO allocate the fees according to the services each actually rendered and, therefore, that MHS–WO receives a portion of DIA's professional fees.

The financial relationship between DIA and MHS–WO is governed by paragraph 10 of the contract (Doc. # 1, Ex. 3). It states, in pertinent part:

> a. *Billing for Professional Services, Generally.* DIA shall establish reasonable charges for professional medical radiology services rendered by physicians providing services on its behalf. . . .

---

**11.** According to the contract (Compl.Ex.3), a unitary fee is defined as "a single payment covering both the professional and technical components of radiology services" (id.¶ 10.d).

**12.** Plaintiff's general allegation that Defendants have reaped a direct economic benefit is a legal conclusion which that Court need not accept as true. Accordingly, the Court will analyze whether Plaintiff's specific allegations, if true, constitute direct economic benefits.

Except as otherwise provided in . this Agreement, each party, at its own expense, shall separately bill and collect from patients or other persons, organizations and/or third-party payers having responsibility therefor, for services rendered to patients pursuant to this Agreement. . . .

d. *Contracts of the Hospitals Providing for Unitary Billing.* Notwithstanding the provisions of Section 10.a. of this Agreement, in the event the Hospitals or long-term care facilities seek to participate in any managed care contract under which the Hospitals, long-term care facilities and DIA are required to accept a single payment covering both the professional and technical components of radiology services, including without limitation such a fee providing for capitation of radiology services ("a Unitary Fee"), or under which it is of practical advantage for the Hospitals, long-term care facilities and DIA to accept a Unitary Fee, the Hospitals, long-term care facilities and DIA shall each designate one representative to negotiate, reasonably and in good faith, an allocation of such Unitary Fee between the Hospitals or long-term care facilities and DIA in an equitable manner with the intention that the parties share in revenues from such Unitary Fee in the same proportions as they share in revenues from separately billed professional medical and technical radiology services. Accordingly, such representatives shall base their allocation primarily upon historical pricing and utilization information of the parties although such representatives shall also consider changes in technology which may affect the validity of such historical pricing and utilization

information. Published information concerning allocation of fees for radiology services between professional and technical components (*e.g.,* the RVS fee schedule for radiology services under the Medicare program), may also be considered in reaching agreement upon allocation of the Unitary Fee.[13]

(Id.¶ 10). A reading of paragraph 10 unequivocally indicates that MHS–WO and CHP do not receive a portion of DIA's professional fees. Paragraph 10.a. specifies that DIA and the Hospitals shall bill separately; there is no suggestion that MHS–WO and CHP would receive any of DIA's professional fees. As noted by all of the parties, paragraph 10.d. specifies that the representatives should negotiate the allocation with the intention that "the parties share in revenues from such Unitary Fee in the same proportions as they share in revenues from separately billed professional medical and technical radiology services." It is clear from this unambiguous language that the parties intended MHS–WO and CHP *not* to receive a portion of DIA's professional fees for its medical services. Rather, the language of the contract clearly indicates the parties' intention that the unitary fee be allocated as though they had billed separately. Read in its entirety, paragraph 10 indicates that DIA and MHS–WO did *not* establish a relationship whereby MHS–WO and CHP would receive a share of DIA's revenues. *See Griffing v. Lucius O. Crosby Mem. Hosp.,* 1984 WL 2936 (S.D.Miss. Jan. 31, 1984)(hospital did not receive direct economic benefit from unitary fee for hospital and radiology services, which was split 60–40%; "the sixty percent payment which the Hospital receives does not include any rebate, commission or other payment from

13. Paragraph 10.d. also provides that if the representatives are not able to agree upon the allocation within thirty days, they shall hire a consultant to determine the appropriate allocation.

[radiologist] or any payment for services actually rendered by [him]. Finally, and significantly, the Hospital itself is not competing in the market for professional radiology services and receives no profit or other payment from any participation in that market."). Accordingly, Plaintiff's Complaint does not allege that MHS–WO and CHP received a direct economic benefit as a result of the exclusive contract between MHS–WO and DIA.[14] Defendant's Motion to Dismiss Plaintiff's tying claims (Count Two and a portion of Count Three) is SUSTAINED.

### D. Res Judicata

 Dr. Osborn and DIA argue that Count Three must be dismissed as to them, because Plaintiff's state law antitrust claims are barred by the doctrine of res judicata (claim preclusion).[15] "Federal courts must give the same effect to a state court judgment that would be given by a court of the state in which the judgment was rendered." *Hapgood v. City of Warren,* 127 F.3d 490, 493 (6th Cir.1997) (quoting *Hospital Underwriting Group, Inc. v. Summit Health Ltd.,* 63 F.3d 486, 494 (6th Cir.1995)), *cert. denied,* 523 U.S. 1046, 118 S.Ct. 1361, 140 L.Ed.2d 511 (1998). The Ohio law of res judicata, or claim preclusion, " 'requires a plaintiff to present every ground for relief in the first action, or be forever barred from asserting it.' " *Id.* at 494 (quoting *National Amusements, Inc. v. City of Springdale,* 53 Ohio St.3d 60, 558 N.E.2d 1178, 1180 (1990)). Claim preclusion exists when "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Twp.,* 73 Ohio St.3d 379, 653 N.E.2d 226, 229 (1995) (adopting 1 Restatement of the Law 2d, Judgments §§ 24–25 (1982)). Claim preclusion has four elements in Ohio: (1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action. *Hapgood,* 127 F.3d at 493; 201 F.3d 693, 703–4 (6th Cir.2000).

 Osborn and DIA argue that each of these elements are met. It is undisputed that Nilavar and these Defendants were involved in a prior state court action in which a final, valid judgment on the merits was issued. The present action involves

14. Plaintiff argues that the district court in *Jefferson Parish* concluded that the hospital used "global billing" and the percentage retained by the hospital was reasonably related to the services it provided, yet the tying claim was not dismissed for lack of a direct economic benefit. As noted by the *Beard* court, the Supreme Court did not address the direct economic benefit requirement in its *Jefferson Parish* decision. Likewise, the *Jefferson Parish* district court did not address that requirement. Accordingly, this Court does not find that the lack of analysis regarding whether the hospital received a direct economic benefit in *Jefferson Parish* requires the conclusion that an equitable unitary fee constitutes such

a benefit, particularly in light of Sixth Circuit precedent.

15. Dr. Osborn and DIA do not argue that Plaintiff's federal antitrust claims are subject to claim preclusion. Because the Court has concluded, *supra,* that Plaintiff has stated a state law antitrust claim for contract in restraint of trade but not a state law illegal tying arrangement claim, Plaintiff's claim preclusion argument is pertinent to the contract in restraint of trade portion of Count Three and is moot regarding the tying arrangement claim. However, the Court's claim preclusion analysis also provides an alternate basis for dismissing the state law tying arrangement claim.

these same three parties. Defendants assert that the state law antitrust action could have been raised in state court. Finally, they contend that the present antitrust litigation arises out of the same transaction or occurrence that gave rise to the state law actions. Specifically, they contend that Osborn's failure to include Nilavar in DIA's bid to provide radiology services at the Mercy Hospitals, resulting in the award of the contract to DIA, was the core of Plaintiff's state action and is the heart of this action as well. Plaintiff responds that his antitrust claim should not be considered part of the "same transaction," and that it falls within the exception set forth in § 26 of the Restatement (Second) of the Law of Judgments (1982).

Section 24 of the Restatement provides, in pertinent part:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Rest. (Second) of the Law of Judgments § 24 (1982). Section 26 provides exceptions to the application of the general rules of claim preclusion as set forth in § 24. It states, in pertinent part:

(1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant: * * * *

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief; or

(d) The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme, or it is the sense of the scheme that the plaintiff should be permitted to split his claim; . . . .

*Id.* § 26.

Plaintiff argues that the "state antitrust and conspiracy claims asserted here have an altogether different factual basis." (Doc. # 16 at 18). He further notes that the antitrust claims in this litigation include defendants which were not included in his state law lawsuit against Dr. Osborn and DIA. Plaintiff has not supported his allegation that the antitrust claims arise from different factual circumstances. In fact, he has failed to articulate the alleged separate transactions. The Court notes that many of the factual allegations in his federal and state court complaints are identical. It is also clear that Plaintiff has alleged in both complaints that Osborn was supposed to negotiate an exclusive contract between SRI and MHS–WO. He did not do so; rather, Osborn formed his own group (which excluded Plaintiff), and he

sought and won the exclusive contract for that new group. Plaintiff's state lawsuit challenged how Osborn and DIA sought the contract; this litigation allegedly challenges the contract that was won. However, these issues overlap, because the antitrust claim is based on allegations that the contract resulted from a conspiracy between Defendants. Thus, both issues stem from one transaction, and should have been litigated together. The fact that additional parties were named as part of the antitrust litigation does not preclude litigation of those claims along with the common law claims. The joinder of additional parties is permitted under the Ohio Rules of Civil Procedure.

Plaintiff cannot rely on section 26 to prevent the application of claim preclusion. Although Plaintiff was required to bring his Sherman Act claims in federal court, due to this Court's exclusive jurisdiction over those claims, he was not prevented from bringing a state antitrust action in state court. The Clark County Court of Common Pleas has subject matter jurisdiction over such state law claims. Furthermore, Plaintiff has not suggested that the state court judgment was plainly inconsistent with the fair and equitable implementation of the antitrust statutory scheme, or that the scheme requires state law antitrust claims to be litigated separately from other common law or statutory claims. Plaintiff's state law antitrust claims against Osborn and DIA are DISMISSED, pursuant to the doctrine of claim preclusion.

III. *State Law Claim for Tortious Interference with a Business Relationship (Count Four)*

█ In Count Four, Plaintiff alleges that Defendants interfered with his business relationships with patients, referring physicians, and insurers by terminating his clinical privileges at the Mercy hospitals. The Hospital Defendants assert that Plaintiff's state law tortious interference claim must be dismissed, because they were privileged to enter into an exclusive contract. Although Plaintiff acknowledges that a hospital may, in certain circumstances, enter into an exclusive contract for the provision of medical services, he argues that Defendants were not privileged to enter into a contract which violates state and federal antitrust laws.

█ A claim for tortious interference with contractual relations occurs, *inter alia,* when a person, without a privilege to do so, purposefully causes a third party not to enter into a contract with another. *A & B–Abell Elevator v. Columbus/Cent. Ohio Bldg.,* 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995); *Kand Med. v. Freund Med. Prods.,* 963 F.2d 125 (6th Cir.1992). In order to determine the existence of a privilege, the fact-finder must consider: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977). Few Ohio courts have addressed whether exclusive contracts may form the basis for a tortious interference claim. In *Holt v. Good Samaritan Hosp. & Health Ctr.,* 69 Ohio App.3d 439, 590 N.E.2d 1318 (1990), Judge Brogan of the Second District Court of Appeals rejected such an argument, noting that adoption of the plaintiff/ physician's argument that a hospital breaches its contract with a physician by entering into an exclusive contract with another provider "would be the death knell of exclusive contracts for medical services." 590 N.E.2d

at 1321. Judge Brogan began with the premise that it is perfectly legitimate for a hospital to enter into an exclusive contract with one or more of the providers of medical services. He concluded by writing, "[w]e will not substitute our judgment for that of hospital boards throughout the nation, by removing a managerial option that has been universally acknowledged as valid and beneficial to the efficient administration of health care." *Id.* Under this reasoning, it would defy logic to say that a hospital can enter into an exclusive contract with a group of physicians providing a particular service, but that it does not have a privilege to do so for purpose of a claim of tortious interference with prospective contractual relationships, in which an excluded physician argues that the hospital is liable for all of the business that physician has lost. Other courts have also concluded that a hospital has a privilege to enter into an exclusive contract, so that an excluded physician does not have a valid claim for tortious interference with prospective contractual relations. *See, e.g., Collins v. Associated Pathologists, Inc.,* 844 F.2d 473 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

. The essential premise to the above analysis is that the exclusive contract between the hospital and the physician group was valid. Assuming that the contract at issue in this litigation is valid, Defendants undoubtedly would be entitled to dismissal of Plaintiff's tortious interference claim. However, as stated above, exclusive dealing contracts between health care providers are not valid *per se.* Herein, Plaintiff has alleged that the exclusive contract between DIA and MHS–WO violates state and federal antitrust laws. Accepting this allegation as true, Plaintiff has alleged that the contract is not valid and, therefore, Defendants did not have a privilege to enter into it. Accordingly, the Court can-

not conclude, as a matter of law, that Plaintiff cannot state a claim for tortious interference with contractual relations. Defendants' Motion to Dismiss that claim is OVERRULED.

### IV. State Law Claim for Breach of Implied Covenant of Good Faith and Fair Dealing (Count Five)

The Hospital Defendants contend that Count Five must be dismissed, because Ohio does not recognize an action for breach of implied covenant of good faith and fair dealing under these circumstances. Plaintiff has agreed to withdraw that claim. Accordingly, Defendants' Motion to Dismiss Plaintiff's state law claim for breach of implied covenant is SUSTAINED.

### V. State Law Claim for Civil Conspiracy (Count Six)

In Count Six, Plaintiff sets forth a state law claim for civil conspiracy. He alleges that Defendants entered into a malicious combination and conspiracy to injure Plaintiff by forcing him out of the Mercy Hospitals and denying him the ability to practice his medical specialty. Five overt acts in furtherance of the conspiracy are alleged, to wit: 1) MHS–WO or CHP, acting through Peterson and Maki, breached its implied covenant of good faith and fair dealing, 2) MHS–WO acted in violation of 26 U.S.C. § 501(c)(3), 3) Defendants violated state and federal antitrust laws, 4) Defendants tortiously interfered with his business relationships, and 5) MHS–WO or CHP unlawfully terminated Plaintiff's clinical privileges. Defendants argue that the civil conspiracy claim must fail, because Plaintiff has not pled an underlying unlawful activity and because certain Defendants may not conspire together, as a matter of law. In addition, Dr. Osborn and DIA

assert that Plaintiff's sixth cause of action is barred by the doctrine of *res judicata.*

As to the arguments set forth by DIA and Osborn, Plaintiff's civil conspiracy claim is DISMISSED as to them, pursuant to the doctrine of claim preclusion, for the reasons set forth above, dismissing his state law antitrust claims under the same doctrine. The Court now turns to the requirements of a civil conspiracy claim and the Hospital Defendants' arguments.

 The Supreme Court of Ohio defines civil conspiracy as " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995) (quoting *LeFort v. Century 21–Maitland Realty Co.,* 32 Ohio St.3d 121, 512 N.E.2d 640, 645 (1987)); *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.,* 219 F.3d 519, 534 (6th Cir.2000). In order to establish a claim of civil conspiracy, the following elements must be proven: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993); *Aetna,* 219 F.3d at 534.

*First,* the Hospital Defendants argue that certain Defendants cannot conspire together. In particular, they assert that the claims against Peterson and Maki must be dismissed, because they acted within the scope of their employment and cannot conspire with MHS–WO. They further argue that CHP should be dismissed, because it cannot conspire with its wholly-owned subsidiary.

 Ohio courts have held that officers or agents of a corporation are immune from suit for civil conspiracy when acting within the course and scope of their corporate positions. *Tandem Staffing v. ABC Automation Packing, Inc.,* 2000 WL 727534 (Ohio App. June 7, 2000); *Scanlon v. Gordon F. Stofer & Bro. Co.,* 1989 WL 69400 (Ohio App. June 22, 1989). *Schrock v. D & N Development, Inc.,* 1995 WL 495488 (Ohio App. June 28, 1995). The intracorporate immunity doctrine (also called the intracorporate conspiracy doctrine) has also been adopted by the Sixth Circuit in antitrust cases. *E.g., Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605 (6th Cir.1990). Plaintiff's Complaint alleges a conspiracy between Maki, Peterson, MHS–WO, CHP, DIA, and Osborn. The Complaint does not allege facts that indicate that Maki and Peterson acted outside of the scope of their employment with MHS–WO, when they negotiated the exclusive contract between MHS–WO and DIA, nor are there allegations that they engaged in any other conduct other than as administrators for MHS–WO. Maki and Peterson are therefore immune from suit for civil conspiracy. Plaintiff's claim arising out of their conduct is properly brought against MHS–WO alone. Accordingly, the civil conspiracy claims against Maki and Peterson must be dismissed.

Defendants' argument that CHP and MHS–WO also cannot conspire together for purposes of a civil conspiracy claim has less support. In *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation and its wholly-owned subsidiary were not legally capable of conspiring with each other under section 1 of the Sherman Act. However, the Court has found no Ohio case law which has adopted that holding for purposes of its state law civil conspiracy claim. The Court's research indicates

only that Ohio courts have adopted the intracorporate conspiracy doctrine, and that only a few Ohio courts of appeals have done so. Accordingly, the Court finds no indication that Ohio courts would adopt the holding in *Copperweld* for purposes of a civil conspiracy claim. The Hospital Defendants' Motion to Dismiss Plaintiff's civil conspiracy claim against CHP, on the basis of the inability of CHP and MHS–WO to conspire with each other, is OVER-RULED.

■■■■ *Second,* the Hospital Defendants contend that Plaintiff has not alleged the fourth element of a civil conspiracy claim. A civil conspiracy claim cannot succeed without an underlying unlawful act. *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998). Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must also fail. *El–Shiekh v. Northwest Ohio Cardiology Consultants, Inc.,* 2000 WL 1298761 (Ohio App. Sept. 15, 2000). "The general rule is that a conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action." *Minarik v. Nagy,* 8 Ohio App.2d 194, 195–96, 193 N.E.2d 280, 281 (Ohio App. 1963). Accordingly, a plaintiff may not bring a claim for conspiracy unless he can also state a claim for the underlying cause of action. *See Hollinghead v. Bey,* 2000 WL 1005205 (Ohio App. July 21, 2000) (dismissing conspiracy claim because the malicious prosecution claim, the underlying cause of action, was barred by the statute

of limitations). As acknowledged by Plaintiff, he cannot bring a claim for breach of the implied covenant of good faith and fair dealing. Accordingly, he also cannot bring a civil conspiracy claim based on that conduct.

■■■■ Nor has Plaintiff stated a claim based on MHS–WO's alleged violation of Internal Revenue Code § 501(c)(3).[16] Although Plaintiff states that MHS–WO committed acts which are not permitted due to its tax-exempt status, he must allege a valid cause of action based on that conduct in order for it to constitute an underlying unlawful act for purpose of his conspiracy claim. *First,* Plaintiff has not attempted to set forth a claim, seeking revocation of MHS–WO's tax-exempt status. *Second,* assuming (without deciding) that MHS–WO's conduct does constitute a violation of its § 501(c)(3) status and that Plaintiff has stated such a claim, the Court finds no indication in the Complaint that Plaintiff has standing to challenge Defendant's federal tax status.[17] Plaintiff's alleged injury is that he was wrongfully prohibited from use of the Mercy Hospitals' radiology facilities, by virtue of the exclusive contract between MHS–WO and DIA. This injury is not traceable to MHS–WO's tax-exempt status. Moreover, revocation of WHS WO's tax-exempt status would not redress Plaintiff's injury. The exclusive contract between that Defendant and DIA would still exist, regardless of MHS–WO's tax status. *See Fulani v. Bentsen,* 35 F.3d 49 (2d Cir.1994)(candidate lacked standing to challenge tax-exempt status of sponsor of

**16.** The Internal Revenue Code, 26 U.S.C. § 501(c)(3) exempts organizations from the payment of income taxes if they meet certain criteria.

**17.** To sue in federal court, an individual plaintiff must show that (1) he or she has suffered an "injury in fact"; (2) there is a

causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision. *American Fed'n Gvt. Employees v. Clinton,* 180 F.3d 727, 729 (6th Cir.1999); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

presidential debates). Because the Complaint does not state a claim seeking revocation of MHS–WO's tax-exempt status and there is no indication that Plaintiff would have standing to do so, Plaintiff has not stated a claim for violation of 26 U.S.C. § 501(c)(3). Accordingly, Plaintiff may not base his civil conspiracy claim on that alleged unlawful act.

▮ Plaintiff's federal and state claims for contract in restraint of trade against MHS–WO and CHP remain in this litigation. However, as stated above, the Supreme Court has stated that MHS–WO and CHP, a parent company and its wholly owned subsidary, cannot conspire within the meaning of section 1 of the Sherman Act, because they "always have a 'unity of purpose or a common design.'" *Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731. Plaintiff has alleged that MHS–WO is a subsidiary of CHP, and there are no allegations to indicate that they do not have a unity of purpose. Rather, Plaintiff has alleged that CHP directed or acquiesced in, and was aware of, the conduct of MHS–WO. Accordingly, the conduct of MHS–WO and CHP must be viewed as the conduct of a single entity. *See Guzowski v. Hartman,* 969 F.2d 211, 213–14 (6th Cir. 1992). Consequently, there are no entities remaining with which MHS–WO could allegedly conspire for purposes of the civil conspiracy claim based on violations of the Sherman Act and the similarly interpreted Valentine Act.[18] Accordingly, Plaintiff cannot rely on his antitrust claims as an underlying claim for his civil conspiracy claim.

Plaintiff has alleged that Defendants have tortiously interfered with his business relationships. That claim remains in this litigation. Accordingly, Plaintiff's civil conspiracy claim based on his tortious interference claim will not be dismissed.

Plaintiff also bases his civil conspiracy claim on the termination of his privileges. Presumably, Plaintiff is asserting that his privileges were terminated without due process. As discussed, *infra,* Plaintiff's due process claim remains in this litigation. Accordingly, he has asserted a civil conspiracy claim based on that conduct.

## VI. *Denial of Right to Due Process (Count Seven)*

In Count Seven, Plaintiff asserts that the Hospital Defendants violated his right to procedural due process when it denied him a hearing on the termination of his hospital privileges. The Hospital Defendants assert that Plaintiff's breach of contract claim must be dismissed on three grounds, to wit: 1) the Hospital Defendants are not state actors; 2) in the absence of a specific contractual provision, procedural due process rights do not attach to the hospital's decision to enter into an exclusive contract; and 3) the Manual does not confer a right to due process.

▮ The Hospital Defendant's first argument is based on the assumption that Plaintiff's claim is brought under the Due Process Clause of the United States Constitution. There is no suggestion in the Complaint that the federal Constitution is implicated. Upon reading the Complaint,

---

18. In summary, DIA and Osborn may not be considered co-conspirators, because Plaintiff's civil conspiracy claim against them must be dismissed under the doctrine of claim preclusion. Maki, Peterson, and MHS–WO are considered one entity, pursuant to the intracorporate conspiracy doctrine. Under *Copperweld,* MHS–WO and CHP are also considered one entity. Although DIA and Osborn may not be considered co-conspirators for purposes of civil conspiracy and state law antitrust claims, they may still constitute co-conspirators for the federal antitrust claim, because that claim remains a viable claim against them.

Plaintiff appears to be stating a claim under Ohio law. In *Khan v. Suburban Community Hosp.*, 45 Ohio St.2d 39, 340 N.E.2d 398 (Ohio 1976), the Ohio Supreme Court emphasized the importance of procedural due process even in a private hospital. It stated:

> Where the board of trustees of a private, nonprofit hospital adopts reasonable, nondiscriminatory criteria for the privilege of practicing major general surgery in the hospital, and procedural due process is followed in adopting and applying such criteria, * * * a court should not substitute its evaluation and judgment of such matters for those of the board of trustees. . . .

*Id.* (syllabus). Following the precedent set in *Khan*, "[c]ourts [in Ohio] have long held that physicians are entitled to procedural due process before a hospital may revoke their staff privileges." *Holt v. Good Samaritan Hosp. and Health*, 69 Ohio App.3d 439, 441, 590 N.E.2d 1318, 1320 (1990)(addressing common law due process claim against private, nonprofit hospital); *see Bouquett v. St. Elizabeth Corp.*, 43 Ohio St.3d 50, 538 N.E.2d 113 (1989). Thus, a common law due process claim in Ohio is not limited to defendants that are state actors. Accordingly, Defendants' first ground is without merit.

*Second*, Defendants contend that in the absence of a specific contractual provision, procedural due process rights do not attach to the hospital's decision to enter into an exclusive contract. Plaintiff states that his due process claim is based solely on the Credentials Policy Manual of the Medical Staff of Mercy Medical Center, Springfield, Ohio ("Manual") (Doc. # 18 at 44). For purposes of their Motion only, Defendants have assumed that the Manual constitutes a contract. Accordingly, the Court need not address whether Plaintiff

has a right to due process in the absence of a contractual provision.

Turning to Defendants' third argument, *i.e.*, that the Manual does not confer due process rights under the instant circumstances, Defendants' argument does not have merit. Specifically, the Hospital Defendants assert that Plaintiff has not identified any provision of the alleged contract (*i.e.*, the Manual) that has been breached. They argue, citing Articles IV and VI of the Manual, that there is no provision which entitles Plaintiff to a hearing upon Mercy's decision to enter into an exclusive contract; rather, only a professional review action triggers due process rights. In response, Plaintiff contends that the provision cited by Defendants in support of their argument that no due process is required when the hospital enters into an exclusive contract (section 6.4) does not apply to new exclusive contracts, as opposed to the termination or expiration of existing exclusive contracts. He further argues that "professional review action" is not limited to the definition provided in the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, *et seq.* Defendants have replied that Plaintiff is correct that section 6.4 deals with only changes or renewals of existing exclusive contracts. However, they argue that section 4.1.4 unambiguously states that hearing rights apply only after a "professional review action or recommendation," and Plaintiff has no general right to a hearing in the situation where his privileges have been terminated for reasons other than his competency or professional conduct.

■■■■ The interpretation of a clear and unambiguous contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. "Only when the language of a contract is unclear or ambiguous, or when the circumstances

surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). In construing the contract, a court must read the contract as a whole and must attempt to give effect to each and every part of it; the court should avoid any interpretation of one part that will annul another part. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 363, 678 N.E.2d 519 (1997). Contractual language is ambiguous "where its meaning cannot be derived from the four corners of the contract or where the language may be reasonably interpreted in more than one way. 'A contract is ambiguous if the rights and duties it imposes on the parties to it are reasonably subject to conflicting interpretations.'" *Westbrock v. Western Ohio Health Care Corp.*, 137 Ohio App.3d 304, 738 N.E.2d 799 (2000) (citations omitted).

The Credentials Policy Manual consists of six articles, to wit: 1) application, appointment and reappointment, 2) clinical privileges, 3) corrective action, 4) hearings and appellate reviews, 5) confidentiality, immunity, and release, and 6) relationship of medical staff membership and contractual services. Article II, which discusses Clinical Privileges, states that privileges are granted for two years, "unless earlier terminated or suspended in accordance with the provisions of this Manual." Manual § 2.3.3. Section 2.8 discusses modification of clinical privileges or department assignment. It states:

> At its own discretion, upon recommendation of the Credentials Committee or pursuant to a request under Section 1.12.1.(b) [dealing with a request for modification of clinical privileges or staff status by the physician], the Executive Committee may recommend a change in the Clinical Privileges or department or section assignment (s) of a Member. The Executive Committee also may recommend that the granting of privileges to a Member be made subject to monitoring and review of the performance of the individual. Such changes shall be subject to the approval of the Governing Body. In the event of any adverse modification of Clinical Privileges, the provisions of Article IV shall apply.

Manual ¶ 2.8.

Section 4.1.4 summarizes when a physician or practitioner is entitled to a hearing. It provides, in pertinent part: "A Physician or Practitioner shall be entitled to a hearing pursuant to the provisions of this Manual only after an adverse professional review recommendation or action involving: ... (f) Reduction or limitation in Staff Status; ... (h) Reduction or limitation in Clinical Privileges...." Under section 4.1.3, "in the event that a professional review action is taken which has or could have an adverse affect on the Medical Staff membership or Clinical Privileges of a Member, the professional review procedures of the Health Care Quality Improvement Act ... shall be substantially followed." Section 4.2.2 states that the Member must be given notice of the adverse professional review action or recommendation and of his right to a hearing and appellate review. Section 4.2.3 further states that the notice required in section 4.2.2 must contain "a concise statement of the acts or omissions on which the decision was based and identifying, where applicable, the medical record number of the patients affected by such acts or omissions or the other reasons or subject matter forming the basis for the adverse professional review action or recommendation."

Article VI concerns the relationship between staff membership and hospital contracts. Section 6.4 directly addresses the effect of the expiration or termination of a contract. It states:

> Expiration or termination of a contract shall affect Staff membership and Clinical Privileges in accordance with the terms of the contract; exclusive contract or agreement with another physician(s) or practitioner(s) for a service previously covered under an expired or terminated contract or agreement shall have the effect of termination of the Clinical Privileges enjoyed under the previous contract. Termination of appointment or Clinical privileges as a result of the actions described herein shall not give rise to the hearing and appeal rights set forth in Article[ ] IV.

 The provisions in the Manual do not unambiguously establish that Plaintiff did not have a right to a hearing regarding the termination of his privileges. By its language, section 2.8 is not limited to situations where the member or applicant's professional merits are at issue. Rather, it states that Article IV shall apply in the event of any adverse modification of clinical privileges. Article IV, however, specifically limits rights to a hearing to adverse professional review actions. Defendants argue that "professional review action" should be interpreted as set forth in the HCQIA, which defines such actions as those based on the competence or professional conduct of the physician. 42 U.S.C. § 11151. However, the Manual does not explicitly adopt that *definition*. Rather, it adopts the *procedures* set forth in the

HCQIA in the event that a professional review action is taken which has or could have an adverse affect on the Medical Staff membership or Clinical Privileges of a Member. Section 4.2.3 appears to support Defendants' position, indicating that notice of the basis of the action must include a statement of the "acts or omissions on which the decision is based...." This provision reasonably implies that the physician must have engaged in acts or omissions as the basis for the adverse professional review action. This, however, is not the only possible interpretation; that phrase could also encompass acts by the governing board, such as entering into an exclusive contract. Moreover, as conceded by Defendants, section 6.4, which discusses the effect of the termination or expiration of an exclusive contract does not cover new exclusive contracts for which no previous contract existed. Thus, although section 6.4 precludes hearing and appeal rights in many circumstances involving exclusive contracts, it does not preclude such rights where an exclusive contract is entered into in the first instance. That provision could, therefore, be interpreted as preserving hearing rights in such circumstances. Accordingly, reading the Manual as a whole, the Court cannot conclude that the document unambiguously provides that a physician does not have a right to a hearing, pursuant to section 2.8, when the termination of clinical privileges results from the hospital having entered into an exclusive contract. Defendant's Motion to Dismiss Plaintiff's Due Process claim, based on the Manual, is OVERRULED.[19]

19. In their reply memorandum, Defendants argue that Plaintiff has not alleged that the alleged deprivation of due process and the alleged breach of contract caused him injury, because Plaintiff states that his claim is not for wrongful termination of his privileges. Construing Plaintiff's arguments in the light most favorable to him, he appears to argue that he was entitled to notice and hearing and that, with such a hearing, the hospitals may have decided to retain his privileges. The Court construes his "concessions" as stating that the contract permits termination of privileges, if done so in accordance with the Man-

## VII. *Breach of Contract (Count Eight)*

Plaintiff alleges that physicians exercising clinical privileges at Mercy hospitals have a contractual relationship with MHS–WO and CHP by virtue of the Credentials Policy Manual ("Manual"). He states that, pursuant to the Manual, he was entitled to notice and a hearing prior to the termination of his clinical privileges. In Count Eight, Plaintiff alleges that MHS–WO and CHP breached their contract with him, by failing to provide him with the requisite notice and hearing, as required by Article IV of the Manual. The Hospital Defendants assert that Plaintiff's breach of contract claim must be dismissed for the same reasons that Plaintiff's due process claim, based on the Credentials Policy Manual, must be dismissed. For the same reasons set forth in addressing the due process claim, Defendant's Motion to Dismiss Plaintiff's breach of contract claim is also OVERRULED.

In summary, the following claims are DISMISSED:

1) Plaintiff's federal and state antitrust claims of an illegal tying arrangement (Count Two and portion of Count Three);

2) state law antitrust claim (Count Three) as brought against DIA and Osborn;

3) state law claim for breach of implied covenant of good faith and fair dealing (Count Five);

4) state law conspiracy claims (Count Six) as brought against DIA, Osborn, Maki and Peterson, in their entirety;

5) state law conspiracy claim (Count Six) against MHS–WO and CHP, as based on the breach of implied covenant of good faith and fair dealing, federal and state antitrust claims, and violation of 26 U.S.C. § 501(c)(3).

The following claims REMAIN:

1) federal antitrust claim for contract in restraint of trade (Count One);

2) state law antitrust claim for contract in restraint of trade (Count Three), as to the Hospital Defendants;

3) state law tortious interference with contractual relations claim (Count Four);

4) state law civil conspiracy claim (Count Six) against MHS–WO and CHP, arising out of tortious interference and due process claims;

5) state law due process claim, based on the Credentials Policy Manual (Count Seven);

6) state law breach of contract claim (Count Eight).

The Hospital Defendants have filed a Motion to Stay Discovery (Doc. # 32–1), pending a ruling on their Motion to Dismiss. In addition, they have requested an expedited hearing on the Motion to Stay (Doc. # 32–2). Both of those Motions are OVERRULED as MOOT.

The parties have filed a Joint Motion for a status conference, preferably in chambers, for the purpose of facilitating the orderly administration of this case (Doc. # 40). Their Motion for a status conference is SUSTAINED, albeit not in person. Counsel listed below will take note that a telephone conference call will be had, beginning at 8:45 a.m., on Wednesday, January 3, 2001, to set a new trial date and other dates leading to the resolution of this litigation.

---

ual (Doc. # 18 at 42, 47). Accordingly, the Court does not read Plaintiff's opposition memorandum as conceding that he cannot establish causation or damages for purposes of his due process and breach of contract claims.