Sundar V. NILAVAR, M.D., Plaintiff,

v.

MERCY HEALTH SYSTEM–
WESTERN OHIO, et al.,
Defendants.

No. C–3–99–612.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 10, 2003.

See, also, 2002 WL 31368026.

Lee Charles Falke, Lee C. Falke & Associates, Dayton, OH, Kenneth A. Lazarus, Maggi Ann Lazarus, Kenneth A. Lazarus & Assoc., Washington, DC, for Plaintiff.

Scott D. Phillips, Frost, Brown, Todd LLC, Cincinnati, OH, for Defendants.

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 84), AND OVERRULING, AS MOOT, PLAINTIFF'S CROSS-MOTION FOR RULE 56(f) RELIEF (DOC. # 88) AND DEFENDANTS' MOTION TO EXTEND TIME TO RESPOND TO SAME (DOC. # 90)

RICE, Chief Judge.

The Plaintiff in the underlying action is Sundar V. Nilavar, M.D. Dr. Nilavar is a radiologist who for years was employed by Springfield Radiology, Inc. ("SRI"). Until 1995, SRI provided diagnostic radiology services to three hospitals in the Springfield and Urbana areas of Ohio. Two of those hospitals are . owned by Mercy Health Systems–Western Ohio ("MHS–WO"), a Defendant herein. As of 1991, SRI was comprised of eleven principals. In March of 1995, MHS–WO invited different radiologists and radiology groups to tender proposals to be its exclusive provider of radiology services. Around that time, one SRI principal, Robin E. Osborn, M.D., left SRI to form his own radiology services group, Diagnostic Imaging Associates of Ohio, Inc. ("DIA"). Dr. Osborn and DIA were also originally named as a Defendants herein. Dr. Osborn took several of his fellow SRI shareholders with him to DIA, but Dr. Nilavar was not among them. On December 4, 1995, DIA was awarded the contract by MHS–WO to be its exclusive provider of radiology services ("Exclusive Contract"). In turn, Dr. Nilavar's privileges at the MHS–WO hospitals were terminated, effective January 1, 1996.

Subsequently, in a state-court action for breach of contract and related common law claims, Dr. Nilavar prevailed against Dr. Osborn. *See Nilavar v. Osborn*, 137 Ohio App.3d 469, 738 N.E.2d 1271 (2000) (affirming judgment in favor of Dr. Nilavar on claim for breach of contract but remanding for further findings of fact relating to damages).[1] The action in this Court was filed in November of 1999. In addition to MHS–WO, Dr. Osborn, and DIA, the following individuals or entities were named as Defendants: Catholic Healthcare Partners ("CHP"), the parent company of MHS–WO; Michael J. Peterson, the former Regional President and CEO of MHS–WO; and Jerold A. Maki, Peterson's successor.

Dr. Nilavar pleaded eight counts in his Verified Complaint (Doc. # 1): (1) contract in restraint of trade, in violation of 15 U.S.C. § 1 (Sherman Act, Section 1); (2) tying arrangement in restraint of trade, also in violation of Section 1 of the Sherman Act; (3) contract and tying arrangement in restraint of trade, in violation of Chapter 1331 of the Ohio Revised Code ("Valentine Act"); (4) tortious interference with a business relationship, in violation of the common law of Ohio; (5) breach of implied covenant of good faith and fair dealing, in violation of the common law of Ohio; (6) civil conspiracy, in violation of the common law of Ohio; (7) denial of common law due process, in violation of

---

1. Affirming jury verdict in Case No. 96–CV–0343 (Clark County C.P.). The jury trial was held from June 1 to June 10, 1999. 738 N.E.2d at 1281.

the common law of Ohio (against MHS–WO and CHP only); and (8) breach of contract, in violation of the common law of Ohio (against MHS–WO and CHP only).

In a published Decision and Entry, 142 F.Supp.2d 859 (S.D.Ohio 2000), the Court dismissed the following claims: Count Two (tying arrangement in restraint of trade under the Sherman Act), as to all Defendants; Count Three (contract and tying arrangement in restraint of trade under the Valentine Act), as to Dr. Osborn and DIA; Count Three, to the extent it was based on an alleged tying arrangement under the Valentine Act, as to MHS–WO, CHP, Peterson and Maki; Count Five (breach of implied covenant of good faith and fair dealing, in violation of the common law of Ohio), as to all Defendants; Count Six (civil conspiracy, in violation of the common law of Ohio), as to Dr. Osborn, DIA, Peterson and Maki; and Count Six, to the extent it was based on the breach of implied covenant of good faith and fair dealing claim, the federal and state antitrust claims, and 26 U.S.C. § 501(c)(3), as to MHS–WO and CHP.

Dr. Nilavar subsequently moved to amend his Verified Complaint (*see* Doc. # 52) in order to allege facts necessary to resuscitate his tying arrangement claims. His Motion was unopposed, and was sustained by the Court by Notation Order of August 1, 2001. Shortly thereafter, Dr. Nilavar filed said amendment. (*See* Doc. # 66.) In a subsequent entry, the Court approved the Stipulation of Dismissal of Claims Against Dr. Osborn and DIA (Doc. # 71), with prejudice. Thus, at present, MHS–WO, CHP, Peterson and Maki remain as Defendants in this case, along with the following claims: Count One (contract in restraint of trade under the Sherman Act); Count Two (tying arrangement in restraint of trade under the Sherman Act); Count Three (contract and tying arrangement in restraint of trade under the

Valentine Act); Count Four (tortious interference with a business relationship, in violation of the common law of Ohio); Count Six (civil conspiracy, in violation of the common law of Ohio), to the extent it is based on the tortious interference and common law due process claims, as to MHS–WO and CHP only; Count Seven (denial of common law due process, in violation of the common law of Ohio), as to MHS–WO and CHP only; and Count Eight (breach of contract, in violation of the common law of Ohio), as to MHS–WO and CHP only.

The remaining Defendants, MHS–WO, CHP, Peterson and Maki ("Defendants"), have now filed a Motion for Summary Judgment (Doc. # 84). Dr. Nilavar has filed a Memorandum in Opposition to same (Doc. # 87), as well as an Alternative Cross–Motion for Relief under Rule 56(f) of the Federal Rules of Civil Procedure (Doc. # 88). (Rule 56(f) allows a court to grant a party opposing summary judgment additional time to obtain necessary affidavits or depositions.)

The Defendants' Motion for Summary Judgment is directed at certain statements Dr. Nilavar has purportedly made under oath in the course of two other legal actions in which he is or was a party. The first is the breach of contract action he brought against Dr. Osborn in the Clark County Common Pleas Court, which was decided in his favor ("Osborn litigation"). The second, also before the Clark County Common Pleas Court, is captioned *Menda v. Springfield Radiologists, Inc.*, Case No. 96–CV–0385 ("Menda litigation"). The Defendants do not make any effort to inform the Court of the subject matter of the Menda litigation, but Dr. Nilavar has represented that it is a malpractice case against him that remains pending. (Doc. # 87 at 6 & n. 1.) In any event, the Defendants contend that Dr. Nilavar asserted

certain facts in these other cases that contradict the assertions he has made herein. Therefore, the Defendants argue, the Court should rule that Dr. Nilavar is judicially estopped from taking these contradictory positions herein. The Defendants also argue that his assertions of fact in the other litigation prove that his federal antitrust claims in this case were filed after the expiration of the limitations period and that he has not suffered an injury for purposes of his antitrust claims or his breach of contract claim. Additional discovery, they contend, is unnecessary, as it will not assist Dr. Nilavar in overcoming the estoppel effect of his prior, sworn testimony.

Dr. Nilavar contends that the Defendants are attempting to thwart discovery on the merits of his claims by directing the Court's attention to statements made in the course of unrelated litigation that, when put in their proper context, do not negate the truth of his allegations in this case. He would have the Court either overrule the Motion, or at least postpone a ruling until further discovery can be conducted on the merits. He also requests oral argument. (Doc. # 87 at 19.)

For the reasons which follow, the Court shall overrule the Defendants' Motion for Summary Judgment, and order that discovery proceed. The Plaintiff's Cross–Motion shall be overruled as moot, as will be the Defendants' Motion to Extend Time to Reply to same (Doc. # 90). In addition, the Court deems the Plaintiff's request for oral argument unnecessary. (*See* Doc. # 87 at 19.)

## I. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726.

## II. *Analysis*

■ "The doctrine of judicial estoppel forbids a party 'from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.'" *Teledyne Indus., Inc. v. National Labor Relations Bd.,* 911 F.2d 1214, 1217 (6th Cir.1990) (quoting *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 472–73 (6th Cir.1988)). The doctrine exists to protect the integrity of the judicial system by preventing litigants from crafting arguments "to suit the exigency of the moment." *Id.* at 1218. The doctrine does not necessarily prevent a party from making statements that are arguably inconsistent with prior statements made under oath, or from maintaining alternative and arguably inconsistent claims within the same lawsuit. *See id.* at 1217 n. 3. Rather, the doctrine is properly invoked where the invoking party can show that the opposing party "took a contrary position under oath in a prior proceeding *and* that the prior position *was accepted by the court." See id.* at 1218 (emphasis added).

■ The Defendants' contentions can be synthesized as follows. In the case at bar, Dr. Nilavar has alleged that he first suffered an "antitrust injury" on December 4, 1995, the date on which the various Defendants (including those now dismissed) formalized the Exclusive Contract. The Court accepted this allegation for purposes of ruling on the Defendants' Motion to Dismiss (Doc. # 17), determining that his claims brought under the Sherman Act were not barred by the statute of limitations. *See* 142 F.Supp.2d at 868. Indeed, in ruling on the Defendants' Motion to Dismiss, which required it to construe the pleadings in a light most favorable to Dr. Nilavar, the Court noted that his pleadings could be accepted for the proposition that "'but for' the exclusive contract, he would still be practicing in the Springfield–Urbana area." *Id.* at 875. Dr. Nilavar has also alleged that he had a contractual relationship with MHS–WO and CHP, and the Court previously ruled that he properly stated a claim for the breach thereof. *See id.* at 894. He has also alleged that the Defendants tortiously interfered with his business relationships with patients, referring physicians and insurers, which, again, the Court found sufficient for purposes of stating a tort claim under the common law of Ohio. *See id.* at 886–87.

The Defendants contend that these allegations are at odds with the position he maintained in the Osborn litigation, which the Common Pleas Court, jury and the Ohio Court of Appeals all relied upon and accepted in making their respective determinations. They contend that these allegations also run contrary to the position he has maintained in the Menda litigation. In support of their argument, they direct the Court's attention to several evidentiary sources: the depositions which Dr. Nilavar purportedly gave in the Menda litigation (Doc. # 84 at Exs. 1 & 14); an excerpt of the purported transcript of the Osborn

litigation jury trial (*id.* at Ex. 2) ("Osborn Transcript"); the deposition which Dr. Nilavar's psychiatrist, Kenneth D. Glass, M.D., purportedly gave in the Menda litigation, along with a patient intake report purportedly rendered by Dr. Glass (*id.* at Exs. 3 & 8); the depositions which Dr. Nilavar purportedly gave in the Osborn litigation (*id.* at Exs. 4 & 5); a 1996 psychiatric report purportedly rendered by Ronald Litvak, M.D. (*id.* at Ex. 9); a 1997 psychiatric report purportedly rendered by Richard H. Clary, M.D. (*id.* at Ex. 10); Dr. Nilavar's appellate brief purportedly submitted to the Second District Court of Appeals in the Osborn litigation (*id.* at Ex. 11) ("Osborn Apellate Brief"); and a long-term disability claim form purportedly submitted by Dr. Nilavar in 1995 (*id.* at Ex. 12).

There are several shortcomings to the Defendants' argument which the Court can point out straight away. *First,* the various purported intake and psychiatric reports, as well as Dr. Nilavar's purported long-term disability claim form, are not sworn statements, and, moreover, the Court has no basis for assuming any court involved in the Menda or Osborn litigation accepted any statements made therein as the "position" of Dr. Nilavar. To the extent they contain prior inconsistent statements, they can be raised at trial on cross-examination, *see* Fed.R.Evid. 613, but they are irrelevant to a judicial estoppel inquiry.

*Second,* because the Court is unaware of what "position" of Dr. Nilavar, if any, the Clark County Common Pleas Court has "accepted" in the Menda litigation, the Defendants' references to that litigation are, at least at present, also irrelevant. Again, to the extent he has made statements in that case which are inconsistent with his position in this case, the Defendants are welcome to rely on such for purposes of impeachment and the like at trial, subject to the Federal Rules of Evidence, but without a greater showing of how they were relevant to any judicial determinations made therein, they may not be used for purposes of invoking the doctrine of judicial estoppel in this case.

*Third,* deposition testimony in general is not relevant, in and of itself, to a judicial estoppel analysis. Prior inconsistent statements given during a deposition are admissible at trial for several purposes. If made by a non-party witness, such as Dr. Glass, they are admissible both for the purpose of impeachment and as substantive evidence. *See* Fed.R.Evid. 613 & 801(d)(1)(A). If made by a party, as say by Dr. Nilavar, the same is true if he were to take the witness stand, and it is possible that the statements could also come in as admissions by a party-opponent. *See id.* Rule 801(d)(2). Regardless, application of the judicial estoppel doctrine requires something more than the mere existence of prior inconsistent statements made under oath.

Before the Court can determine that Dr. Nilavar is judicially estopped from pursuing his allegations in this case, the Defendants must show not only that arguably inconsistent statements were made, but that they were integral to the factual *position* which Dr. Nilavar maintained in his other litigation, *and* that this position was *accepted* by the other courts in rendering their respective decisions. Of the materials adduced herein by the Defendants, only the Osborn Transcript and the Osborn Appellate Brief are relevant to the Court's judicial estoppel analysis. These materials, along with the published appellate decision affirming the jury verdict in his favor, *see* 137 Ohio App.3d 469, 738 N.E.2d 1271; *see also* 127 Ohio App.3d 1, 711 N.E.2d 726 (1998) (affirming in part and reversing in part motion for summary judgment), are helpful in determining whether Dr. Nilavar took a position which

is factually inconsistent with that which he maintains herein; all of the other materials upon which they rely are not helpful.

Before the Court examines the Osborn Transcript and Osborn Appellate Brief, it will address a related argument raised by the Defendants. In that argument, they invoke the rule that a party cannot assert by affidavit a fact which creates a genuine issue of material fact for the sheer purpose of surviving summary judgment, where that assertion contradicts an assertion the party had previously made in his or her deposition. *See Peck v. Bridgeport Machines, Inc.,* 237 F.3d 614, 619 (6th Cir. 2001); *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986). For lack of a better term, this rule might be described as pre-trial estoppel. Though the context in which it is utilized is different, it serves the same function as judicial estoppel: it operates to prevent a party from playing "fast and loose" with the courts by creating "sham" issues of fact. *See Reynolds,* 861 F.2d at 472; *Farrell v. Automobile Club of Mich.,* 870 F.2d 1129, 1131 (6th Cir.1989). Two obvious defects lead the Court to conclude that this alternative argument lacks merit: neither a deposition of Dr. Nilavar nor a contradictory affidavit of his has been produced for the Court's consideration. Instead, though set forth as a separate argument in their Motion, the Defendants more or less conflate this rule of pre-trial estoppel with the doctrine of judicial estoppel, pointing to the identical evidentiary sources in support of the proposition that Dr. Nilavar should not be allowed to pursue his allegations herein because of what he has previously stated under oath in the other litigation.

These distinct rules should not be conflated. Though they serve the common aim of maintaining the integrity of the judicial process, they operate in distinct contexts, and are not part of one unbroken continuum. The rule of pre-trial estoppel says that a party cannot say one thing at a deposition only to reverse course when his deposition is used against him in a motion for summary judgment in the same litigation. The doctrine of judicial estoppel operates in a broader context, and says that a party cannot, in front of one court, maintain one factual position, which is the product of not only his own testimony but also that of other witnesses and of evidentiary materials, and then maintain a contradictory factual position in front of another court. The Defendants would have this Court recognize a third rule which blends these two: that a party who has said one thing in his deposition taken in relation to one case cannot contradict himself in a subsequent case. The problem with this proposition is that the Federal Rules of Evidence already speak to the situation. As noted above, the Rules of Evidence already address how prior sworn statements are to be treated as a matter of evidence. Adopting the Defendants' proposed rule would require the Court to take the extraordinary step of transforming factual questions traditionally left for the ultimate trier of fact, including questions concerning a party's or witness' honesty and veracity, into legal questions for the Court to decide prior to trial. That would be improper.

Rejection of the argument raised herein by the Defendants will not leave courts any *more* vulnerable to subterfuge. There will always be parties ready and able to color the facts in different hues depending on present necessity. Cross-examination, as guided by the Federal Rules of Evidence, is generally the best mechanism for dealing with this exigency. *See Teledyne,* 911 F.2d at 1218. A court should only preempt the fact-finding process, and state as a matter of law that a party's factual position at a given time is impermissible, when it is obvious on the face of things that a party is abusing civil procedure for

the purpose of preventing the court from rendering an adverse ruling. In such a case, the Court may step in to prevent the " 'perversion of judicial machinery.' " *See Reynolds,* 861 F.2d at 472 (quoting *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 (6th Cir.1982)). Thus, when a party opposing a motion for summary judgment asserts a fact that contradicts an earlier statement given at his deposition, *and* it is obvious that he is trying to subvert the dictates of Rule 56 of the Federal Rules of Civil Procedure, it is proper for the trial court to disregard the recently fabricated assertion. By the same token, where the transcript of an earlier trial or appellate proceeding exists and it is apparent what position a party took therein, and it is also apparent that the court in charge of that proceeding accepted and relied upon the party's position, then it is proper for the court in the present proceeding not to allow the same party to maintain a factually contradictory position in the case before it. Neither of those two rules speaks to how a court should treat evidentiary materials that were created as part of earlier litigation but did not become part of the record therein, or were not otherwise part of the aggregate of materials and testimony upon which a party's factual position was based therein. Because, in such a case, only the opposing party stands the potential to be misled by newly concocted testimony, not the court, any sworn, prior inconsistent statements that do exist are properly raised on cross-examination at trial, per the Federal Rules of Evidence.

■ Turning to the Osborn Transcript and Osborn Appellate Brief, five claims are implicated by the Defendants' argument:

Counts One and Two (violations of the Sherman Act), Count Three (violations of the Valentine Act), Count Four (tortious interference with a business relationship) and Count Six (civil conspiracy), to the extent it is premised on a conspiracy to tortiously interfere with Dr. Nilavar's business relationships.[2] Two major questions are raised: *first,* should Dr. Nilavar be estopped from taking the position that the Defendants caused his current inability to practice radiology in his geographical area, given his argument in the Osborn litigation that he was incapable as a matter of mental health from practicing medicine after September 22, 1995; and *second,* should he be estopped from taking the position that the Defendants either had the intent to cause, or actually did cause, his current inability to practice radiology, given his argument in the Osborn litigation that MHS–WO played no role in his being excluded from DIA, and that it was the fact that he was excluded from DIA, a fact attributable to Dr. Osborn alone, that caused him injury (argued therein as an injury owing to breach of contract). The Court will discuss these questions separately, beginning with the first.

The Osborn Transcript tends to reveal that Dr. Nilavar stopped working as a radiologist at the MHS–WO hospitals on September 22, 1995, due to the mental stress he endured as a result of not being selected by Dr. Osborn to join DIA, and that he had not, as of the date of his testimony (in June of 1999), returned to the practice of medicine. (Osborn Transcript at 595–97, 701–02.) The transcript also tends to reveal that the cause of his inability to practice after September 22,

---

**2.** The Court has no occasion to engage in an analysis of the Defendants' argument as it relates to Dr. Nilavar's claims for denial of common law due process (Count Seven) and breach of contract (Count Eight), because the brief excerpt of the Osborn Transcript and the Osborn Appellate Brief are not enlightening on these matters. Regarding their argument on the statute of limitations, the Court *does* not find it well taken, for the reasons stated in its decision on their Motion to Dismiss. *See* 142 F.Supp.2d at 867–68.

1995, was Dr. Osborn's failure to select him to join DIA. (*Id.* at 700–01.) Importantly, the reason given by Dr. Nilavar as to why he had not returned to his radiology practice as of the date of his testimony was not that he was "locked out" by anti-competitive forces, but that he was not emotionally capable of doing so. As he purportedly stated: "I don't want to kill anybody because I want to have good patient care; and the way my emotional state is right now, I'm not certain—I would like to go back, you know." (*Id.* at 702.) This testimony tends to demonstrate that Dr. Nilavar's inability to find work after January 1, 1996, the effective date of Exclusive Contract, was *not* the result of the Defendants' formalization of the Exclusive Contract on December 4, 1995, and thus not the result of the Defendants' alleged anti-competitive acts.

Likewise, in his appellate brief, Dr. Nilavar stated the following in his recitation of the facts:

> As a result of Osborn's conduct in excluding Nilavar from the contract with [MHS–WO], and Nilavar's resultant loss of employment and staff privileges, Nilavar developed a disabling depression and in the opinion of Nilavar's treating psychiatrist, Dr. Glass, Nilavar would never be able to return to the practice of radiology. [Citation omitted.] Evidence was presented by other psychiatrists who did not challenge Glass' diagnosis or prognosis for Nilavar. [Citation omitted.]

(Osborn Appellate Brief at 12.) Dr. Nilavar also argued on appeal that Dr. Osborn would have known his act of excluding him from the newly formed DIA would "cause Nilavar to lose his employment...." (*Id.* at 25.) In addition, he stressed on appeal that his damages should include a calcula-

tion of lost earnings up to the age of 65. (*Id.* at 12.)[3]

Dr. Nilavar argues that the Defendants misconstrue his previous testimony and arguments, and, what is more, that they overlook the fact that the injury he suffered as a result of Dr. Osborn's breach of contract, which was the subject of the Osborn litigation, is separate and distinct from the alleged injury he suffered as a result of the Defendants' anti-competitive acts, and that the Osborn jury's determination that he did, in fact, suffer the former does not preclude a finding that he also suffered the latter. The Court believes that Dr. Nilavar has missed the point that the Defendants would have this Court recognize. They are not arguing that, in theory, an injury owing to a breach of contract cannot exist alongside a separate and distinct injury owing to anti-competitive acts. They are merely arguing that, given Dr. Nilavar's testimony in the Osborn litigation and his arguments to the Second District Court of Appeals, he cannot demonstrate in this action that their act of formalizing of the Exclusive Contract on December 4, 1995, gave rise to an antitrust injury. That is to say, *even if* the Court (or jury) could find that their conduct was illegal, in that it violated the Sherman Act, Dr. Nilavar cannot show that said conduct was the *proximate cause of his* injury, and the Court (or jury) could not find that " 'but for' the exclusive contract, he would still be practicing in the Springfield–Urbana area." *See* 142 F.Supp.2d at 875.

Though logical, the Court finds that the Defendants' argument in this regard is one that must be made at trial. Though he perhaps misunderstood the Defendants' legal argument, Dr. Nilavar correctly points

---

3. Dr. Nilavar was 53 years old when he filed his Verified Complaint in this Court in November of 1999. (Verif.Compl. ¶ 20.)

out that it is not necessarily inconsistent for him to maintain that he suffered both a breach-of-contract injury and an antitrust injury. The Court recognized this point in ruling on the Defendants' Motion to Dismiss. The Defendants' argument relates to the question of causation, which cannot be disposed of with reference to the Osborn Transcript and the Osborn Appellate Brief. To be "inconsistent" for purposes of incurring dismissal of a present claim pursuant to the doctrine of judicial estoppel, a party's prior position must have been squarely at odds with its present position, not merely in tension therewith. See Teledyne, 911 F.2d at 1217 n. 3; Fed. R.Civ.P. 8(e)(2) (allowing a party to state alternative claims for relief).

In order for the doctrine of judicial estoppel to be applicable with respect to the Sherman Act and Valentine Act claims, the Defendants would have to show that Dr. Nilavar had affirmatively maintained in the Osborn litigation the position that he was not prevented from practicing radiology after January 1, 1996, by any acts of the Defendants herein, and that this position was integral to the rendering of the verdict and judgment in his favor, and the decision issued by the court of appeals (i.e., that his position had been accepted by the courts (and jury) to which it had been presented). As far as the Court can discern, whatever effect the alleged actions taken by the Defendants herein had on Dr.

Nilavar, they were not material to his case against Dr. Osborn for breach of contract.

In that case, Dr. Nilavar successfully proved that in May of 1995, the SRI principals agreed to break into two separate practice groups, one of which would negotiate a new working arrangement with the MHS–WO hospitals, the other of which would negotiate a new arrangement with the third hospital in the area. See 738 N.E.2d at 1278–80, 1282–85. The breach occurred when Dr. Osborn formed DIA, to the exclusion of Dr. Nilavar and several other SRI principals who had practiced primarily at the MHS–WO hospitals, and entered into the Exclusive Contract with MHS–WO, a fact of which Dr. Nilavar became aware on or shortly after September 1, 1995. See id. at 1280; see also 142 F.Supp.2d at 868. The focus of Dr. Nilavar's argument in the Osborn litigation was on injuries flowing from that breach, and nothing presented thus far to the Court in this case reveals that he disclaimed the existence of a separate antitrust injury caused by MHS–WO, arising on or after December 4, 1996, in order to prevail on his breach of contract claim against Dr. Osborn. Indeed, he had no reason to do so. Therefore, the Court does not find that he "unequivocally" asserted a position contrary to the one he asserts herein. See Teledyne, 911 F.2d at 1217. The two positions are not inconsistent.[4]

4. Put another way, judicial estoppel would be proper only if a verdict in Dr. Nilavar's favor on his antitrust claims would cast doubt upon the integrity of the verdict he received in his favor in the Osborn litigation. See New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citing Edwards, 690 F.2d at 599). Such would not be the case herein. There is a significant difference between a plaintiff who takes the position that he has suffered only one injury, as caused by a single defendant, and the plaintiff who takes the position that the sole cause of one particular injury was the defendant and nobody else. In the latter case, nothing forecloses the plaintiff's right to allege separate injuries at a later date, as caused by separate parties, including parties who the plaintiff might have stated previously were not the cause of his first injury. While the Defendants may use Dr. Nilavar's position in the Osborn litigation to prove that they did not cause Dr. Nilavar injury of any type, Dr. Nilavar's ability to prove otherwise is not foreclosed by his former position. For that reason, judicial estoppel is not proper.

*Reynolds, supra,* which involved tax and bankruptcy matters, provides a good example of when the doctrine of judicial estoppel should be invoked. The facts of that case revealed that the IRS had assessed and collected a tax on a gain which it had, pursuant to a settlement agreement approved in bankruptcy court, attributed to the bankruptcy petitioner's wife. 861 F.2d at 471–72. Subsequently, the IRS assessed a tax on the same gain against the bankruptcy petitioner. *Id.* at 472. The tax court upheld the second assessment, and the petitioner appealed on the basis that the tax court should have held that the IRS was judicially estopped from assessing the tax on him on a gain which it had already attributed to his wife, pursuant to the approval of the bankruptcy court. *Id.* The Sixth Circuit agreed, holding that the bankruptcy court's approval of the settlement agreement was evidence in itself that the bankruptcy court had accepted the IRS's representation that the gain was attributable to the bankruptcy petitioner's wife, such that the IRS could not turn around in tax court and argue that the gain was attributable to the bankruptcy petitioner himself. *Id.* at 473–74.

The facts of this case are quite different. It can easily be imagined that a plaintiff such as Dr. Nilavar could plead in one civil action an antitrust claim such as that plead herein and a supplemental breach of contract claim such as that plead in the Osborn litigation against Dr. Osborn. Such a plaintiff would not be obligated to choose between alternative remedies, and as long as the facts obtained in discovery gave rise to genuine issues of material fact as to each claim, both could survive summary judgment even if, logically speaking, it would be legally inconsistent for the plaintiff to prevail on both claims at trial. The final decision is for the jury. This is even more true where it would not necessarily be legally inconsistent for the plaintiff to prevail on both claims.

The same principle applies in this instance. Arguably, under the facts of this case, Dr. Nilavar's Sherman Act claims (and similar claims under the Valentine Act) are at tension with his claim that he was rendered unable to practice medicine by Dr. Osborn's act of breach of contract. This is so not because the claims conflict as a matter of law, but because Dr. Nilavar's previous statements and arguments tend to show that, due to his injuries flowing from Dr. Osborn's breach, accruing no later than September 1, 1995, he would not have been able to practice medicine even if he had not suffered a subsequent antitrust injury. However, that his claims are in tension does not mean he cannot pursue the Sherman Act claims on their merits, only that the Defendants have a ready defense on, among other things, the element of causation.

Moreover, giving Dr. Nilavar the benefit of all reasonable inferences for purposes of ruling on summary judgment, it is also possible to infer that a jury could find the Defendants herein liable for Sherman Act violations even while acknowledging Dr. Nilavar's testimony in the Osborn litigation that he was otherwise incapacitated from a medical point of view as of January 1, 1996, and for several years thereafter. Keeping in mind that the Defendants have brought their Motion on the limited legal ground that Dr. Nilavar is judicially estopped from contradicting prior sworn statements, and not on the basis that he is unable to adduce facts sufficient to create a genuine issue on the merits of his claims (*see* Doc. # 84 at 1 n. 1), the Court need not contemplate, at present, exactly how he might demonstrate that he suffered an antitrust injury in addition to the injury owing to Dr. Osborn's breach. For the reasons already stated, the arguments raised by the Defendants in their Motion for Summary Judgment, relating as they do to the element of causation, bear on the

weight of any evidence Dr. Nilavar might adduce; they do not support the invocation and application of the judicial estoppel doctrine. Thus, it is enough to note that, as the Court stated in ruling on the Defendants' Motion to Dismiss, Dr. Nilavar has properly stated his several claims, and deserves an opportunity to gather facts in support of his allegations. After he has been given the opportunity to do so, the Defendants may challenge his case from an evidentiary standpoint, but he must be given his due opportunity to discover facts in support of his position.[5]

█ Other portions of the Osborn Appellate Brief give rise to a more difficult question: should Dr. Nilavar be estopped from taking the position that the Defendants either had the intent to cause, or did cause, his current inability to practice radiology, given his argument in the Osborn litigation that MHS–WO played no role in his exclusion from DIA, and that it was the fact that he was excluded from DIA, a fact attributable to Dr. Osborn alone, that caused him injury.

Dr. Nilavar submitted the following statement of fact to the Ohio Court of Appeals:

> The exclusion of Nilavar ... from DIA physicians was not required by [MHS–WO], because [MHS–WO] never had a "hit list" of doctors it wanted removed from its staff [citation omitted] and never indicated any preference that certain doctors be included or excluded from any proposal [citation omitted]. The contract between DIA and [MHS–WO]

did not give [MHS–WO] the right to unilaterally exclude a physician from the DIA group [citation omitted] and when [MHS–WO] approved Osborn's proposal, [it] had very little information about the physicians Osborn was proposing to hire [citation omitted], several of whom had no prior affiliation with [it] at that time [citation omitted]. Similarly, [MHS–WO] never told Osborn that including Nilavar or any other particular physician would have killed his bid [citation omitted].

(Osborn Appellate Brief at 10.) The Court of Appeals acknowledged this argument in responding to, and rejecting, Dr. Osborn's argument that it was erroneous for the trial court to allow the jury to consider Dr. Nilavar's lost anticipated income (or lost profits). *Nilavar,* 738 N.E.2d at 1289. Dr. Osborn had argued that Dr. Nilavar could not demonstrate any such damages because had his name been included on the list of DIA radiologists, MHS–WO would not have accepted DIA's bid to become its exclusive provider of radiology services, and thus there would have been no Exclusive Contract, and no income to anticipate. *Id.* The appellate court disagreed:

> Osborn's own witnesses ... acknowledged that the inclusion of Nilavar's name in the bid would not have killed DIA's bid, as Osborn asserts. These witnesses also acknowledged that [MHS–WO] did not have a list of certain physicians whom they did not want included on the staff of their exclusive service provider.... Under these cir-

---

**5.** The Defendants repeat with some frequency the rule that one cannot demonstrate an antitrust injury if he is unable to show that a violation of the antitrust laws was the "necessary predicate" of his injury. (*E.g.,* Doc. # 84 at 14–16.) *See* 142 F.Supp.2d at 869–78; *Valley Prods. v. Landmark,* 128 F.3d 398, 403–04 (6th Cir.1997). At bottom, the question is one of proximate cause. Though their argument may be well taken at some point, it is

erroneously raised in conjunction with a judicial estoppel argument. The prior sworn statements on which they rely do not demonstrate a "successful" and "unequivocal" prior inconsistent position on the part of Dr. Nilavar. Their probative value may well be great, but such must be considered from an evidentiary point of view. To that end, Dr. Nilavar must be given the opportunity to discover probative evidence of his own.

cumstances, the jury could have found that DIA's bid would have been successful even with the inclusion of Nilavar's name. *Id.* at 1289–90. Indeed, the appellate court even found that the evidence was sufficient for the jury to have found that MHS–WO would have given serious consideration to a bid from SRI, the original group of radiologists with which it had worked for some time, and of which Dr. Nilavar was a shareholder. *Id.* at 1289.

In other words, the jury agreed with Dr. Nilavar that MHS–WO had nothing to do with his exclusion from DIA, and that Dr. Osborn's breach alone caused him to miss out on certain anticipated income. Furthermore, the Court of Appeals affirmed the jury's award of damages. Thus, it makes sense to argue that Dr. Nilavar should not be permitted to change the position he maintained in the Osborn litigation, which was clearly accepted at both the trial and appellate levels, and now argue that MHS–WO (and its parent company and individual executives) caused him to suffer an antitrust injury, or tortiously interfered with his business relationships with patients, referring physicians and insurers. The position Dr. Nilavar took in the Osborn litigation tends to suggest that the Defendants did not have the requisite tortious intent to interfere with his business relationships. Moreover, his previous position also tends to support the proposition that, regardless of any ill intent, they were not the proximate cause of any injury that befell him, be it one arising in antitrust or tort, given that they had no input into whether he was selected to join DIA, and thus no proximate effect on his exclusion from the Exclusive Contract.

In overruling the Defendants' Motion to Dismiss as it related to Dr. Nilavar's antitrust claims, the Court recognized that the antitrust laws make no exception for exclusive medical service provider contracts where such unreasonably restrain competition in the relevant markets. 142 F.Supp.2d at 873. Then, focusing on the pleadings, as it was required to do under Fed.R.Civ.P. 12(b)(6), it found that Dr. Nilavar had alleged in sufficient fashion that the Exclusive Contract between MHS–WO and DIA unreasonably prevented him from practicing radiology in the relevant geographic market after January 1, 1996, and that the Defendants' various arguments for dismissal all turned on factual issues that were not proper to consider on a Rule 12(b)(6) motion. *Id.* at 873–78. It therefore overruled their Motion as it related to the antitrust claims.

Insofar as the Defendants' Motion related to Dr. Nilavar's claim for tortious interference, the Court did not address the elements of intent or causation because they were not the focal point of the Defendants' argument. *See* 142 F.Supp.2d at 886–87. Rather, the Court assumed these elements to be present, as it was required to do for purposes of ruling on that Motion, and focused its attention on the argument raised by the Defendants at that time, which was that they were privileged to enter into the Exclusive Contract, such that a claim of tortious interference could not be stated against them. *See id.* (recognizing that an otherwise tortious act of interference with a business relationship will not subject the putative tortfeasor to liability if its act is privileged). The Court recognized that the few courts which have addressed the question have held that a hospital is privileged to enter into exclusive service provider contracts, and that by doing so it does not subject itself to liability for a claim of tortious interference. *See id.* (citing *Holt v. Good Samaritan Hosp. & Health Ctr.,* 69 Ohio App.3d 439, 590 N.E.2d 1318 (1990) & *Collins v. Associated Pathologists, Inc.,* 844 F.2d 473 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988)). Nevertheless,

the Court held that the cited holdings were premised on the assumption that the underlying exclusive contracts, targeted by the respective plaintiffs as tortious, were themselves legal. *Id.* at 887, 109 S.Ct. 137. Because the Court could not state as a matter of law that the Exclusive Contract at issue in this case was legal, given that it was conceivable that it violated the antitrust laws, it followed that it was also possible that the Exclusive Contract was not privileged. *Id.* The Court therefore overruled the Defendants' Motion to Dismiss the tortious interference claim.

The Defendants' current focus is not on the privilege issue, but on the elements of intent and causation. Their argument is that regardless of the underlying legality of the Exclusive Contract, Dr. Nilavar is judicially estopped from arguing to this Court that the Defendants harbored a tortious intent to interfere with his business relationships, or proximately caused him injury in tort or as a matter of antitrust law, given that he successfully argued in the Osborn litigation that they played no such role in the creation of DIA, and thus no role in foreclosing him from the benefits of the Exclusive Contract.

Their argument presents a close case, but the Court must again agree with Dr. Nilavar that summary judgment on the basis of judicial estoppel would not be proper. The shortcoming to the Defendants' argument is that it focuses on the wrong point in time. Their focus herein is on Dr. Osborn's "act" of excluding Dr. Nilavar from DIA. They argue that because Dr. Nilavar was never a part of DIA, it was that fact, not the subsequent fact that they entered into the Exclusive Contract with DIA, that caused all of his alleged injuries. Moreover, they argue, because he successfully and unequivocally took the position in the Osborn litigation that they showed no intent for him to be excluded from DIA, and had no input on

the matter, they cannot be held liable for causing his alleged subsequent injuries in tort or those arising under the antitrust laws.

Their argument would be persuasive if not for the fact that Dr. Nilavar's antitrust claims and tortious interference claim do not turn on his being excluded from DIA. More importantly, from what the Court can glean from the published appellate opinion in the *Osborn litigation*, 137 Ohio App.3d 469, 738 N.E.2d 1271, Dr. Osborn did not argue in that case, regarding the issue of damages, that it was, if anything, the exclusivity of the Exclusive Contract, not his own decision not to select Dr. Nilavar to be a member of DIA, that led to any lost income Dr. Nilavar might otherwise have anticipated. For example, Dr. Osborn might have argued in the Osborn litigation that Dr. Nilavar could have formed a competing group of radiologists and bid for the Exclusive Contract in his own right, and that his failure to do so, in combination with MHS–WO's insistence upon an exclusive service provider contract, was the cause of his lost anticipated income, not the fact that he was excluded from DIA. Dr. Nilavar might then have felt compelled to put on evidence that it was not MHS–WO's insistence upon an exclusive service provider contract that caused his damages, but Dr. Osborn's initial refusal to select him to be a member of DIA. If that had been his position, then Dr. Nilavar's position herein would be "clearly inconsistent," *see New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), and were he to prevail on the merits, the result would cast doubt upon the integrity of the judicial process in either the state courts or this Court. *See id.* (citing *Edwards,* 690 F.2d at 599). Judicial estoppel, thus, would be warranted.

That scenario does not exist. The focus in the Osborn litigation, on the issue of damages, was what effect, if any, MHS–WO or MHS–WO's attitude toward Dr. Nilavar had on Dr. Osborn's decision to exclude him from DIA, and whether his inclusion would have prevented MHS–WO from entering into the Exclusive Contract with DIA in the first instance. The temporal focus of that case was May–September, 1995. Because he had no need to, Dr. Nilavar never took a position on what effect MHS–WO's subsequent act of entering into the Exclusive Contract, on December 4, 1995, had on his ability to practice radiology.

This case, by contrast, is about whether the Defendants' act of entering into the Exclusive Contract with DIA, which resulted in Dr. Nilavar's loss of privileges at the MHS–WO hospitals, was a violation of the antitrust laws and/or an act of tortious interference. *See* 142 F.Supp.2d at 873, 886. Were Dr. Nilavar's current focus on the Defendants' actions as they related to his not having been selected to join DIA, the Court would agree that he would be judicially estopped from trying to make such a case, given that he successfully and unequivocally argued to the Clark County Common Pleas Court and the Second District Court of Appeals that the Defendants neither intended for him to be excluded from DIA nor caused his exclusion (an argument which convinced the jury and the appellate court that Dr. Osborn *alone* caused his injury, characterized therein as an injury owing to breach of contract, by excluding him from DIA). However, the temporal focus of his claims in this case is different than that of the claim at issue in the Osborn litigation, and should he prevail herein on any of his antitrust claims or his tortious interference claim, there is no rea-

son to think that such a result will lack integrity, or cast doubt upon the integrity of the result in the Osborn litigation.

Ultimately, Dr. Nilavar's position in the Osborn litigation regarding the effect of MHS–WO's actions (and those of the other Defendants herein) on his ability to practice radiology after his hospital privileges were revoked on January 1, 1996, must be treated for the present in the same manner as the position he took regarding the effect of his mental health on his ability to work. His positions as to both issues tend to support the Defendants' arguments that their actions, regardless of whether they were tortious, or illegal as a matter of antitrust law, were not the proximate cause of his injuries and his inability to find work as a radiologist after January 1, 1996. Be that as it may, their arguments, relating as they do to the element of causation, are ones to be raised on cross-examination at trial (or, at the earliest, in a motion for summary judgment directed at Dr. Nilavar's ability to adduce facts giving rise to a genuine issue of material fact on any of his claims). Absent evidence that Dr. Nilavar actually took a position on the effect of the Defendants' act of entering into the Exclusive Agreement and terminating his privileges to practice radiology at the MHS–WO hospitals *as of January 1, 1996,* the Court cannot find that his position in the Osborn litigation on the question of damages squarely contradicts the position he has taken herein.

Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 84) is OVER-RULED.[6] This ruling is without prejudice, and the Defendants may file a motion for summary judgment at a later point in time directed at the actual merits of Dr. Nilavar's various claims. However, the

---

6. As Dr. Nilavar points out, a procedural defect in the Defendants' argument also exists: they have not authenticated by affidavit the

evidentiary materials upon which they rely. *See* Fed.R.Civ.P. 56(e).

Court agrees with Dr. Nilavar that, ordinarily, the summary judgment process is not to be done in piecemeal fashion. (*See* Doc. # 88 at 3–4.) Thus, the parties are to continue to cooperate in the discovery process, in conformity with the Federal Rules of Civil Procedure, and the Court's prior decision sustaining Dr. Nilavar's Motion to Compel. *See* 210 F.R.D. 597 (S.D.Ohio 2002). The Court will not rule on any future motion for summary judgment until it is satisfied that Dr. Nilavar has obtained adequate discovery. In the meantime, because it is now moot, Dr. Nilavar's Cross–Motion for Rule 56(f) Relief (Doc. # 88) is OVERRULED, as is the Defendants' Motion to Extend Time to Respond to Plaintiff's Cross–Motion (Doc. # 90). Finally, this matter being resolved, there is no need for oral argument, as Dr. Nilavar requested (Doc. # 87 at 19).